## MITCHELL ET AL. *v.* HELMS ET AL.

No. 98–1648. Argued December 1, 1999—Decided June 28, 2000

798

THOMAS, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and SCALIA and KENNEDY, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, in which

BREYER, J., joined, *post*, p. 836.   SOUTER, J., filed a dissenting opinion, in which STEVENS and GINSBURG, JJ., joined, *post*, p. 867.

*Michael W. McConnell* argued the cause for petitioners. With him on the briefs were *Patricia A. Dean, Andrew T. Karron, John C. Massaro,* and *Steffen N. Johnson.*

*Deputy Solicitor General Underwood* argued the cause for respondents.   With her on the briefs were *Solicitor General Waxman, Acting Assistant Attorney General Ogden, Paul R. Q. Wolfson, Michael Jay Singer,* and *Howard S. Scher.*

*Lee Boothby* argued the cause for respondents.   With him on the brief was *Nicholas P. Miller.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Ohio et al. by *Betty D. Montgomery,* Attorney General of Ohio, *Edward B. Foley,* State Solicitor, *Robert C. Maier,* Assistant Solicitor, and by the Attorneys General for their respective States as follows: *Ken Salazar* of Colorado, *Robert A. Butterworth* of Florida, *James E. Ryan* of Illinois, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Jennifer M. Granholm* of Michigan, *Mike Moore* of Mississippi, *Don Stenberg* of Nebraska, *John J. Farmer, Jr.,* of New Jersey, *Charles M. Condon* of South Carolina, and *Mark L. Earley* of Virginia; for the City of New York et al. by *Michael D. Hess, Leonard J. Koerner,* and *Edward F. X. Hart;* for the American Center for Law and Justice by *Jay Alan Sekulow, John P. Tuskey, Walter W. Weber, Colby M. May,* and *Vincent P. McCarthy;* for the Arizona Council for Academic Private Education et al. by *Edward McGlynn Gaffney, Jr.,* and *David J. Hessler;* for the AVI CHAI Foundation by *Nathan Lewin, Julia E. Guttman,* and *Jody Manier Kris;* for the Becket Fund for Religious Liberty by *Kevin J. Hasson* and *Eric W. Treene;* for the Catholic League for Religious and Civil Rights by *Robert P. George;* for the Knights of Columbus by *Kevin T. Baine* and *Emmet T. Flood;* for the United States Catholic Conference by *Mark E. Chopko, John A. Liekweg,* and *Jeffrey Hunter Moon;* and for the Washington Legal Foundation by *Daniel J. Popeo* and *R. Shawn Gunnarson.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Drew S. Days III, Anthony M. Radice, Lev L. Dassin,* and *Laura R. Taichman;* for the Baptist Joint Committee on Public Affairs by *Melissa Rogers* and *J. Brent Walker;* for the Interfaith Religious Liberty Foundation et al. by *Derek Davis* and *Alan J. Reinach;* for the National Committee for Public Education and Religious Liberty et al. by *Marshall Beil* and *Philip Goldstein;* for the National Education

Justice Thomas announced the judgment of the Court and delivered an opinion, in which The Chief Justice, Justice Scalia, and Justice Kennedy join.

As part of a longstanding school-aid program known as Chapter 2, the Federal Government distributes funds to state and local governmental agencies, which in turn lend educational materials and equipment to public and private schools, with the enrollment of each participating school determining the amount of aid that it receives. The question is whether Chapter 2, as applied in Jefferson Parish, Louisiana, is a law respecting an establishment of religion, because many of the private schools receiving Chapter 2 aid in that parish are religiously affiliated. We hold that Chapter 2 is not such a law.

## I

### A

Chapter 2 of the Education Consolidation and Improvement Act of 1981, Pub. L. 97–35, 95 Stat. 469, as amended, 20 U. S. C. §§ 7301–7373,[1] has its origins in the Elementary and Secondary Education Act of 1965 (ESEA), Pub. L. 89–10, 79 Stat. 55, and is a close cousin of the provision of the ESEA

Association by *Robert H. Chanin, Jeremiah A. Collins,* and *Michael D. Simpson;* for the National Jewish Commission on Law and Public Affairs by *Dennis Rapps, David Zwiebel, Nathan Diament,* and *Nathan Lewin;* and for the National School Boards Association et al. by *Julie Underwood, Jay Worona,* and *Pilar Sokol.*

Briefs of *amici curiae* were filed for the Christian Legal Society et al. by *Steven T. McFarland, Samuel B. Casey,* and *Carl H. Esbeck;* for the Institute for Justice et al. by *William H. Mellor* and *Clint Bolick;* for the Pacific Legal Foundation by *Sharon L. Browne* and *Deborah J. La Fetra;* and for the Rutherford Institute by *John W. Whitehead* and *Steven H. Aden.*

[1] Chapter 2 is now technically Subchapter VI of Chapter 70 of 20 U. S. C., where it was codified by the Improving America's Schools Act of 1994, Pub. L. 103–382, 108 Stat. 3707. For convenience, we will use the term "Chapter 2," as the lower courts did. Prior to 1994, Chapter 2 was codified at 20 U. S. C. §§ 2911–2976 (1988 ed.).

that we recently considered in *Agostini* v. *Felton*, 521 U. S. 203 (1997). Like the provision at issue in *Agostini*, Chapter 2 channels federal funds to local educational agencies (LEA's), which are usually public school districts, via state educational agencies (SEA's), to implement programs to assist children in elementary and secondary schools. Among other things, Chapter 2 provides aid

> "for the acquisition and use of instructional and educational materials, including library services and materials (including media materials), assessments, reference materials, computer software and hardware for instructional use, and other curricular materials." 20 U. S. C. § 7351(b)(2).

LEA's and SEA's must offer assistance to both public and private schools (although any private school must be nonprofit). §§ 7312(a), 7372(a)(1). Participating private schools receive Chapter 2 aid based on the number of children enrolled in each school, see § 7372(a)(1), and allocations of Chapter 2 funds for those schools must generally be "equal (consistent with the number of children to be served) to expenditures for programs . . . for children enrolled in the public schools of the [LEA]," § 7372(b). LEA's must in all cases "assure equitable participation" of the children of private schools "in the purposes and benefits" of Chapter 2. § 7372(a)(1); see § 7372(b). Further, Chapter 2 funds may only "supplement and, to the extent practical, increase the level of funds that would . . . be made available from non-Federal sources." § 7371(b). LEA's and SEA's may not operate their programs "so as to supplant funds from non-Federal sources." *Ibid.*

Several restrictions apply to aid to private schools. Most significantly, the "services, materials, and equipment" provided to private schools must be "secular, neutral, and non-ideological." § 7372(a)(1). In addition, private schools may not acquire control of Chapter 2 funds or title to Chapter 2

materials, equipment, or property. § 7372(c)(1). A private school receives the materials and equipment listed in § 7351(b)(2) by submitting to the LEA an application detailing which items the school seeks and how it will use them; the LEA, if it approves the application, purchases those items from the school's allocation of funds, and then lends them to that school.

In Jefferson Parish (the Louisiana governmental unit at issue in this case), as in Louisiana as a whole, private schools have primarily used their allocations for nonrecurring expenses, usually materials and equipment. In the 1986–1987 fiscal year, for example, 44% of the money budgeted for private schools in Jefferson Parish was spent by LEA's for acquiring library and media materials, and 48% for instructional equipment. Among the materials and equipment provided have been library books, computers, and computer software, and also slide and movie projectors, overhead projectors, television sets, tape recorders, VCR's, projection screens, laboratory equipment, maps, globes, filmstrips, slides, and cassette recordings.[2]

It appears that, in an average year, about 30% of Chapter 2 funds spent in Jefferson Parish are allocated for private schools. For the 1985–1986 fiscal year, 41 private schools participated in Chapter 2. For the following year, 46 participated, and the participation level has remained relatively constant since then. See App. 132a. Of these 46, 34 were Roman Catholic; 7 were otherwise religiously affiliated; and 5 were not religiously affiliated.

B

Respondents filed suit in December 1985, alleging, among other things, that Chapter 2, as applied in Jefferson Parish,

---

[2] Congress in 1988 amended the section governing the sorts of materials and equipment available under Chapter 2. Compare 20 U. S. C. § 3832(1)(B) (1982 ed.) with § 7351(b)(2) (1994 ed.). The record in this case closed in 1989, and the effect of the amendment is not at issue.

violated the Establishment Clause of the First Amendment of the Federal Constitution. The case's tortuous history over the next 15 years indicates well the degree to which our Establishment Clause jurisprudence has shifted in recent times, while nevertheless retaining anomalies with which the lower courts have had to struggle.

In 1990, after extended discovery, Chief Judge Heebe of the District Court for the Eastern District of Louisiana granted summary judgment in favor of respondents. *Helms* v. *Cody*, Civ. A. No. 85–5533, 1990 WL 36124 (Mar. 27), App. to Pet. for Cert. 137a. He held that Chapter 2 violated the Establishment Clause because, under the second part of our three-part test in *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613 (1971), the program had the primary effect of advancing religion. Chapter 2 had such effect, in his view, because the materials and equipment loaned to the Catholic schools were direct aid to those schools and because the Catholic schools were, he concluded after detailed inquiry into their doctrine and curriculum, "pervasively sectarian." App. to Pet. for Cert. 151a. Chief Judge Heebe relied primarily on *Meek* v. *Pittenger*, 421 U. S. 349 (1975), and *Wolman* v. *Walter*, 433 U. S. 229 (1977), in which we held unconstitutional programs that provided many of the same sorts of materials and equipment as does Chapter 2. In 1994, after having resolved the numerous other issues in the case, he issued an order permanently excluding pervasively sectarian schools in Jefferson Parish from receiving any Chapter 2 materials or equipment.

Two years later, Chief Judge Heebe having retired, Judge Livaudais received the case. Ruling in early 1997 on post-judgment motions, he reversed the decision of former Chief Judge Heebe and upheld Chapter 2, pointing to several significant changes in the legal landscape over the previous seven years. *Helms* v. *Cody*, 1997 WL 35283 (Jan. 28), App. to Pet. for Cert. 79a. In particular, Judge Livaudais cited our 1993 decision in *Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S. 1, in which we held that a State could, as part

of a federal program for the disabled, provide a sign-language interpreter to a deaf student at a Catholic high school.

Judge Livaudais also relied heavily on a 1995 decision of the Court of Appeals for the Ninth Circuit, *Walker* v. *San Francisco Unified School Dist.*, 46 F. 3d 1449, upholding Chapter 2 on facts that he found "virtually indistinguishable." The Ninth Circuit acknowledged in *Walker*, as Judge Heebe had in his 1990 summary judgment ruling, that *Meek* and *Wolman* appeared to erect a constitutional distinction between providing textbooks (permissible) and providing any other in-kind aid (impermissible). 46 F. 3d, at 1464–1465; see *Board of Ed. of Central School Dist. No. 1* v. *Allen*, 392 U. S. 236 (1968) (upholding textbook program). The Court of Appeals viewed this distinction, however, as "thin" and "unmoored from any Establishment Clause principles," and, more importantly, as "rendered untenable" by subsequent cases, particularly *Zobrest*. 46 F. 3d, at 1465–1466. These cases, in the Ninth Circuit's view, revived the principle of *Allen* and of *Everson* v. *Board of Ed. of Ewing*,[3] that "state benefits provided to all citizens without regard to religion are constitutional." 46 F. 3d, at 1465. The Ninth Circuit also relied, *id.*, at 1467, on our observation in *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet*, 512 U. S. 687 (1994), that "we have frequently relied explicitly on the general availability of any benefit provided religious groups or individuals in turning aside Establishment Clause challenges," *id.*, at 704. The Ninth Circuit purported to distinguish *Meek* and *Wolman* based on the percentage of schools receiving aid that were parochial (a large percentage in those cases and a moderate percentage in *Walker*), 46 F. 3d, at 1468, but that court undermined this distinction when it observed that *Meek* also upheld "the massive provision of text-

---

[3] *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1 (1947) (upholding reimbursement to parents for costs of busing their children to public or private school).

books to parochial schools." 46 F. 3d, at 1468, n. 16. Thus, although the Ninth Circuit did not explicitly hold that *Meek* and *Wolman* were no longer good law, its reasoning seemed to require that conclusion.

Finally, in addition to relying on our decision in *Zobrest* and the Ninth Circuit's decision in *Walker*, Judge Livaudais invoked *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995), in which, a few months after *Walker*, we held that the Establishment Clause does not require a public university to exclude a student-run religious publication from assistance available to numerous other student-run publications.

Following Judge Livaudais' ruling, respondents appealed to the Court of Appeals for the Fifth Circuit. While that appeal was pending, we decided *Agostini*, in which we approved a program that, under Title I of the ESEA, provided public employees to teach remedial classes at private schools, including religious schools. In so holding, we overruled *Aguilar* v. *Felton*, 473 U. S. 402 (1985), and partially overruled *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373 (1985), both of which had involved such a program.

The Fifth Circuit thus faced a dilemma between, on the one hand, the Ninth Circuit's holding and analysis in *Walker* and our subsequent decisions in *Rosenberger* and *Agostini*, and, on the other hand, our holdings in *Meek* and *Wolman*. To resolve the dilemma, the Fifth Circuit abandoned any effort to find coherence in our case law or to divine the future course of our decisions and instead focused on our particular holdings. *Helms* v. *Picard*, 151 F. 3d 347, 371 (1998). It thought such an approach required not only by the lack of coherence but also by *Agostini*'s admonition to lower courts to abide by any applicable holding of this Court even though that holding might seem inconsistent with our subsequent decisions, see *Agostini*, 521 U. S., at 237. The Fifth Circuit acknowledged that *Agostini*, by recognizing our rejection of the rule that "all government aid that directly assists the

educational function of religious schools is invalid," *id.*, at 225, had rejected a premise of *Meek*, but that court nevertheless concluded that *Agostini* had neither directly overruled *Meek* and *Wolman* nor rejected their distinction between textbooks and other in-kind aid. The Fifth Circuit therefore concluded that *Meek* and *Wolman* controlled, and thus it held Chapter 2 unconstitutional. We granted certiorari. 527 U. S. 1002 (1999).

## II

The Establishment Clause of the First Amendment dictates that "Congress shall make no law respecting an establishment of religion." In the over 50 years since *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1 (1947), we have consistently struggled to apply these simple words in the context of governmental aid to religious schools.[4] As we admitted in *Tilton* v. *Richardson*, 403 U. S. 672 (1971), "candor compels the acknowledgment that we can only dimly perceive the boundaries of permissible government activity in this sensitive area." *Id.*, at 678 (plurality opinion); see *Lemon*, 403 U. S., at 671 (White, J., concurring in judgment).

In *Agostini*, however, we brought some clarity to our case law, by overruling two anomalous precedents (one in whole, the other in part) and by consolidating some of our previously disparate considerations under a revised test. Whereas in *Lemon* we had considered whether a statute (1) has a secular purpose, (2) has a primary effect of advancing or inhibiting religion, or (3) creates an excessive entanglement between government and religion, see 403 U. S., at 612–613, in *Agostini* we modified *Lemon* for purposes of evaluating aid to schools and examined only the first and second factors, see 521 U. S., at 222–223. We acknowledged

---

[4] Cases prior to *Everson* discussed the issue only indirectly, see, *e. g.*, *Vidal* v. *Philadelphia*, 2 How. 127, 198–200 (1844); *Quick Bear* v. *Leupp*, 210 U. S. 50, 81 (1908), or evaluated aid to schools under other provisions of the Constitution, see *Cochran* v. *Louisiana Bd. of Ed.*, 281 U. S. 370, 374–375 (1930).

that our cases discussing excessive entanglement had applied many of the same considerations as had our cases discussing primary effect, and we therefore recast *Lemon*'s entanglement inquiry as simply one criterion relevant to determining a statute's effect. *Agostini, supra,* at 232–233. We also acknowledged that our cases had pared somewhat the factors that could justify a finding of excessive entanglement. 521 U. S., at 233–234. We then set out revised criteria for determining the effect of a statute:

"To summarize, New York City's Title I program does not run afoul of any of three primary criteria we currently use to evaluate whether government aid has the effect of advancing religion: It does not result in governmental indoctrination; define its recipients by reference to religion; or create an excessive entanglement." *Id.,* at 234.

In this case, our inquiry under *Agostini*'s purpose and effect test is a narrow one. Because respondents do not challenge the District Court's holding that Chapter 2 has a secular purpose, and because the Fifth Circuit also did not question that holding, cf. 151 F. 3d, at 369, n. 17, we will consider only Chapter 2's effect. Further, in determining that effect, we will consider only the first two *Agostini* criteria, since neither respondents nor the Fifth Circuit has questioned the District Court's holding, App. to Pet. for Cert. 108a, that Chapter 2 does not create an excessive entanglement. Considering Chapter 2 in light of our more recent case law, we conclude that it neither results in religious indoctrination by the government nor defines its recipients by reference to religion. We therefore hold that Chapter 2 is not a "law respecting an establishment of religion." In so holding, we acknowledge what both the Ninth and Fifth Circuits saw was inescapable—*Meek* and *Wolman* are anomalies in our case law. We therefore conclude that they are no longer good law.

A

As we indicated in *Agostini*, and have indicated elsewhere, the question whether governmental aid to religious schools results in governmental indoctrination is ultimately a question whether any religious indoctrination that occurs in those schools could reasonably be attributed to governmental action. See *Agostini, supra*, at 226 (presence of sign-language interpreter in Catholic school " 'cannot be attributed to *state* decisionmaking' " (quoting *Zobrest*, 509 U. S., at 10) (emphasis added in *Agostini*)); 521 U. S., at 230 (question is whether "any use of [governmental] aid to indoctrinate religion could be attributed to the State"); see also *Rosenberger*, 515 U. S., at 841–842; *Witters* v. *Washington Dept. of Servs. for Blind*, 474 U. S. 481, 488–489 (1986); *Mueller* v. *Allen*, 463 U. S. 388, 397 (1983); cf. *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327, 337 (1987) ("For a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence"). We have also indicated that the answer to the question of indoctrination will resolve the question whether a program of educational aid "subsidizes" religion, as our religion cases use that term. See *Agostini*, 521 U. S., at 230–231; see also *id.*, at 230.

In distinguishing between indoctrination that is attributable to the State and indoctrination that is not, we have consistently turned to the principle of neutrality, upholding aid that is offered to a broad range of groups or persons without regard to their religion. If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government. For attribution of indoctrination is a relative question. If the government is offering assistance to recipients who provide, so to speak, a broad range of indoctrination, the government itself is not thought responsible for any par-

ticular indoctrination. To put the point differently, if the government, seeking to further some legitimate secular purpose, offers aid on the same terms, without regard to religion, to all who adequately further that purpose, see *Allen*, 392 U. S., at 245–247 (discussing dual secular and religious purposes of religious schools), then it is fair to say that any aid going to a religious recipient only has the effect of furthering that secular purpose. The government, in crafting such an aid program, has had to conclude that a given level of aid is necessary to further that purpose among secular recipients and has provided no more than that same level to religious recipients.

As a way of assuring neutrality, we have repeatedly considered whether any governmental aid that goes to a religious institution does so "only as a result of the genuinely independent and private choices of individuals." *Agostini, supra,* at 226 (internal quotation marks omitted). We have viewed as significant whether the "private choices of individual parents," as opposed to the "unmediated" will of government, *Ball,* 473 U. S., at 395, n. 13 (internal quotation marks omitted), determine what schools ultimately benefit from the governmental aid, and how much. For if numerous private choices, rather than the single choice of a government, determine the distribution of aid pursuant to neutral eligibility criteria, then a government cannot, or at least cannot easily, grant special favors that might lead to a religious establishment. Private choice also helps guarantee neutrality by mitigating the preference for pre-existing recipients that is arguably inherent in any governmental aid program, see, *e. g.,* Gilder, The Revitalization of Everything: The Law of the Microcosm, Harv. Bus. Rev. 49 (Mar./Apr. 1988), and that could lead to a program inadvertently favoring one religion or favoring religious private schools in general over nonreligious ones.

The principles of neutrality and private choice, and their relationship to each other, were prominent not only in *Agos-*

*tini, supra,* at 225–226, 228, 230–232, but also in *Zobrest, Witters,* and *Mueller.*[5] The heart of our reasoning in *Zobrest,* upholding governmental provision of a sign-language interpreter to a deaf student at his Catholic high school, was as follows:

> "The service at issue in this case is part of a general government program that distributes benefits neutrally to any child qualifying as 'disabled' under the [statute], without regard to the 'sectarian-nonsectarian, or public-nonpublic nature' of the school the child attends. By according parents freedom to select a school of their choice, the statute ensures that a government-paid interpreter will be present in a sectarian school only as a result of the private decision of individual parents. In other words, because the [statute] creates no financial incentive for parents to choose a sectarian school, an interpreter's presence there cannot be attributed to state decisionmaking." 509 U. S., at 10.

As this passage indicates, the private choices helped to ensure neutrality, and neutrality and private choices together eliminated any possible attribution to the government even when the interpreter translated classes on Catholic doctrine.

*Witters* and *Mueller* employed similar reasoning. In *Witters,* we held that the Establishment Clause did not bar a State from including within a neutral program providing tuition payments for vocational rehabilitation a blind person studying at a Christian college to become a pastor, missionary, or youth director. We explained:

> "Any aid . . . that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients. Washington's

---

[5] JUSTICE O'CONNOR acknowledges that "neutrality is an important reason for upholding government-aid programs," one that our recent cases have "emphasized . . . repeatedly." *Post,* at 838 (opinion concurring in judgment).

program is made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited and . . . creates no financial incentive for students to undertake sectarian education. . . . [T]he fact that aid goes to individuals means that the decision to support religious education is made by the individual, not by the State.

.          .          .          .          .

"[I]t does not seem appropriate to view any aid ultimately flowing to the Inland Empire School of the Bible as resulting from a *state* action sponsoring or subsidizing religion." 474 U. S., at 487–488 (footnote, citations, and internal quotation marks omitted).[6]

Further, five Members of this Court, in separate opinions, emphasized both the importance of neutrality and of private choices, and the relationship between the two. See *id.*, at

---

[6] The majority opinion also noted that only a small portion of the overall aid under the State's program would go to religious education, see *Witters*, 474 U. S., at 488, but it appears that five Members of the Court thought this point irrelevant. See *id.*, at 491, n. 3 (Powell, J., joined by Burger, C. J., and REHNQUIST, J., concurring) (citing *Mueller* v. *Allen*, 463 U. S. 388, 401 (1983), to assert that validity of program "does not depend on the fact that petitioner appears to be the only handicapped student who has sought to use his assistance to pursue religious training"); 474 U. S., at 490 (White, J., concurring) (agreeing with "most of Justice Powell's concurring opinion with respect to the relevance of *Mueller*," but not specifying further); *id.*, at 493 (O'CONNOR, J., concurring in part and concurring in judgment) (agreeing with Justice Powell's reliance on *Mueller* and explaining that the program did not have an impermissible effect, because it was neutral and involved private choice, and thus "[n]o reasonable observer is likely to draw from the facts before us an inference that the State itself is endorsing a religious practice or belief"). More recently, in *Agostini* v. *Felton*, 521 U. S. 203 (1997), we held that the proportion of aid benefiting students at religious schools pursuant to a neutral program involving private choices was irrelevant to the constitutional inquiry. *Id.*, at 229 (refusing "to conclude that the constitutionality of an aid program depends on the number of sectarian school students who happen to receive the otherwise neutral aid"); see also *post*, at 848 (O'CONNOR, J., concurring in judgment) (quoting this passage).

490–491 (Powell, J., joined by Burger, C. J., and REHNQUIST, J., concurring); *id.*, at 493 (O'CONNOR, J., concurring in part and concurring in judgment); see also *id.*, at 490 (White, J., concurring).

The tax deduction for educational expenses that we upheld in *Mueller* was, in these respects, the same as the tuition grant in *Witters*. We upheld it chiefly because it "neutrally provides state assistance to a broad spectrum of citizens," 463 U. S., at 398–399, and because "numerous, private choices of individual parents of school-age children," *id.*, at 399, determined which schools would benefit from the deductions. We explained that "[w]here, as here, aid to parochial schools is available only as a result of decisions of individual parents no 'imprimatur of state approval' can be deemed to have been conferred on any particular religion, or on religion generally." *Ibid.* (citation omitted); see *id.*, at 397 (neutrality indicates lack of state *imprimatur*).

*Agostini*'s second primary criterion for determining the effect of governmental aid is closely related to the first. The second criterion requires a court to consider whether an aid program "define[s] its recipients by reference to religion." 521 U. S., at 234. As we briefly explained in *Agostini, id.*, at 230–231, this second criterion looks to the same set of facts as does our focus, under the first criterion, on neutrality, see *id.*, at 225–226, but the second criterion uses those facts to answer a somewhat different question—whether the criteria for allocating the aid "creat[e] a financial incentive to undertake religious indoctrination," *id.*, at 231. In *Agostini* we set out the following rule for answering this question:

> "This incentive is not present, however, where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis. Under such circumstances, the aid is less likely to have the effect of advancing religion." *Ibid.*

The cases on which *Agostini* relied for this rule, and *Agostini* itself, make clear the close relationship between this rule, incentives, and private choice. For to say that a program does not create an incentive to choose religious schools is to say that the private choice is truly "independent," *Witters*, 474 U. S., at 487. See *Agostini, supra,* at 232 (holding that Title I did not create any impermissible incentive, because its services were "available to all children who meet the Act's eligibility requirements, no matter what their religious beliefs or where they go to school"); *Zobrest*, 509 U. S., at 10 (discussing, in successive sentences, neutrality, private choice, and financial incentives, respectively); *Witters, supra,* at 488 (similar). When such an incentive does exist, there is a greater risk that one could attribute to the government any indoctrination by the religious schools. See *Zobrest, supra,* at 10.

We hasten to add, what should be obvious from the rule itself, that simply because an aid program offers private schools, and thus religious schools, a benefit that they did not previously receive does not mean that the program, by reducing the cost of securing a religious education, creates, under *Agostini*'s second criterion, an "incentive" for parents to choose such an education for their children. For *any* aid will have some such effect. See *Allen,* 392 U. S., at 244; *Everson,* 330 U. S., at 17; see also *Mueller,* 463 U. S., at 399.

## B

Respondents inexplicably make no effort to address Chapter 2 under the *Agostini* test. Instead, dismissing *Agostini* as factually distinguishable, they offer two rules that they contend should govern our determination of whether Chapter 2 has the effect of advancing religion. They argue first, and chiefly, that "direct, nonincidental" aid to the primary educational mission of religious schools is always impermissible. Second, they argue that provision to religious schools of aid that is divertible to religious use is similarly impermis-

sible.[7] Respondents' arguments are inconsistent with our more recent case law, in particular *Agostini* and *Zobrest*, and we therefore reject them.

1

Although some of our earlier cases, particularly *Ball*, 473 U. S., at 393–394, did emphasize the distinction between direct and indirect aid, the purpose of this distinction was

---

[7] Respondents also contend that Chapter 2 aid supplants, rather than supplements, the core educational function of parochial schools and therefore has the effect of furthering religion. Our case law does provide some indication that this distinction may be relevant to determining whether aid results in governmental indoctrination, see *Agostini*, 521 U. S., at 228–229; *Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S. 1, 12 (1993); but see *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373, 396 (1985), but we have never delineated the distinction's contours or held that it is constitutionally required.

Nor, to the extent that the supplement/supplant line is separable from respondents' direct/indirect and "no divertibility" arguments, do we need to resolve the distinction's constitutional status today, for, as we have already noted, Chapter 2 itself requires that aid may only be supplemental. 20 U. S. C. § 7371(b). See also *post*, at 867 (O'CONNOR, J., concurring in judgment) (declining to decide whether supplement/supplant distinction is a constitutional requirement); but see *post*, at 852 (explaining that computers are "necessary" to "the educational process"). We presume that whether a parish has complied with that statutory requirement would be, at the very least, relevant to whether a violation of any constitutional supplement/supplant requirement has occurred, yet we have no reason to believe that there has been any material statutory violation. A statewide review by the Louisiana SEA indicated that § 7371(b) receives nearly universal compliance. App. 112a. More importantly, neither the District Court nor the Fifth Circuit even hinted that Jefferson Parish had violated § 7371(b), and respondents barely mention the statute in their brief to this Court, offering only the slimmest evidence of any possible violation, see *id.*, at 63a. Respondents argue that any Chapter 2 aid that a school uses to comply with state requirements (such as those relating to computers and libraries) necessarily violates whatever supplement/supplant line may exist in the Constitution, but our decision in *Committee for Public Ed. and Religious Liberty* v. *Regan*, 444 U. S. 646 (1980), upholding reimbursement to parochial schools of costs relating to state-mandated testing, rejects any such blanket rule.

merely to prevent "subsidization" of religion, see *id.*, at 394. As even the dissent all but admits, see *post*, at 889 (opinion of SOUTER, J.), our more recent cases address this purpose not through the direct/indirect distinction but rather through the principle of private choice, as incorporated in the first *Agostini* criterion (*i. e.*, whether any indoctrination could be attributed to the government). If aid to schools, even "direct aid," is neutrally available and, before reaching or benefiting any religious school, first passes through the hands (literally or figuratively) of numerous private citizens who are free to direct the aid elsewhere, the government has not provided any "support of religion," *Witters, supra,* at 489. See *supra*, at 810. Although the presence of private choice is easier to see when aid literally passes through the hands of individuals—which is why we have mentioned directness in the same breath with private choice, see, *e. g., Agostini,* 521 U. S., at 226; *Witters, supra,* at 487; *Mueller, supra,* at 399—there is no reason why the Establishment Clause requires such a form.

Indeed, *Agostini* expressly rejected the absolute line that respondents would have us draw. We there explained that "we have departed from the rule relied on in *Ball* that all government aid that directly assists the educational function of religious schools is invalid." 521 U. S., at 225. *Agostini* relied primarily on *Witters* for this conclusion and made clear that private choice and neutrality would resolve the concerns formerly addressed by the rule in *Ball.* It was undeniable in *Witters* that the aid (tuition) would ultimately go to the Inland Empire School of the Bible and would support religious education. We viewed this arrangement, however, as no different from a government issuing a paycheck to one of its employees knowing that the employee would direct the funds to a religious institution. Both arrangements would be valid, for the same reason: "[A]ny money that ultimately went to religious institutions did so 'only as a result of the genuinely independent and private choices of' individuals."

*Agostini, supra,* at 226 (quoting *Witters,* 474 U. S., at 487). In addition, the program in *Witters* was neutral. 521 U. S., at 225 (quoting *Witters, supra,* at 487).

As *Agostini* explained, the same reasoning was at work in *Zobrest,* where we allowed the government-funded interpreter to provide assistance at a Catholic school, "even though she would be a mouthpiece for religious instruction," because the interpreter was provided according to neutral eligibility criteria and private choice. 521 U. S., at 226. Therefore, the religious messages interpreted by the interpreter could not be attributed to the government, see *ibid.* (We saw no difference in *Zobrest* between the government hiring the interpreter directly and the government providing funds to the parents who then would hire the interpreter. 509 U. S., at 13, n. 11.) We rejected the dissent's objection that we had never before allowed "a public employee to participate directly in religious indoctrination." See *id.,* at 18 (opinion of Blackmun, J.). Finally, in *Agostini* itself, we used the reasoning of *Witters* and *Zobrest* to conclude that remedial classes provided under Title I of the ESEA by public employees did not impermissibly finance religious indoctrination. 521 U. S., at 228; see *id.,* at 230–232. We found it insignificant that students did not have to directly apply for Title I services, that Title I instruction was provided to students in groups rather than individually, and that instruction was provided in the facilities of the private schools. *Id.,* at 226–229.

To the extent that respondents intend their direct/indirect distinction to require that any aid be literally placed in the hands of schoolchildren rather than given directly to the school for teaching those same children, the very cases on which respondents most rely, *Meek* and *Wolman,* demonstrate the irrelevance of such formalism. In *Meek,* we justified our rejection of a program that loaned instructional materials and equipment by, among other things, pointing out that the aid was loaned to the schools, and thus was "direct

aid." 421 U. S., at 362–363. The materials-and-equipment program in *Wolman* was essentially identical, except that the State, in an effort to comply with *Meek*, see *Wolman*, 433 U. S., at 233, 250, loaned the aid to the students. (The revised program operated much like the one we upheld in *Allen*. Compare *Wolman, supra*, at 248, with *Allen*, 392 U. S., at 243–245.) Yet we dismissed as "technical" the difference between the two programs: "[I]t would exalt form over substance if this distinction were found to justify a result different from that in *Meek*." 433 U. S., at 250. *Wolman* thus, although purporting to reaffirm *Meek*, actually undermined that decision, as is evident from the similarity between the reasoning of *Wolman* and that of the *Meek* dissent. Compare *Wolman, supra*, at 250 (The "technical change in legal bailee" was irrelevant), with *Meek, supra*, at 391 (REHNQUIST, J., concurring in judgment in part and dissenting in part) ("Nor can the fact that the school is the bailee be regarded as constitutionally determinative"). That *Meek* and *Wolman* reached the same result, on programs that were indistinguishable but for the direct/indirect distinction, shows that that distinction played no part in *Meek*.

Further, respondents' formalistic line breaks down in the application to real-world programs. In *Allen*, for example, although we did recognize that students themselves received and owned the textbooks, we also noted that the books provided were those that the private schools required for courses, that the schools could collect students' requests for books and submit them to the board of education, that the schools could store the textbooks, and that the textbooks were essential to the schools' teaching of secular subjects. See 392 U. S., at 243–245. Whether one chooses to label this program "direct" or "indirect" is a rather arbitrary choice, one that does not further the constitutional analysis.

Of course, we have seen "special Establishment Clause dangers," *Rosenberger*, 515 U. S., at 842, when *money* is

given to religious schools or entities directly rather than, as in *Witters* and *Mueller*, indirectly. See 515 U. S., at 842 (collecting cases); *id.*, at 846–847 (O'CONNOR, J., concurring); see also *Bowen* v. *Kendrick*, 487 U. S. 589, 608–609 (1988); compare *Committee for Public Ed. and Religious Liberty* v. *Regan*, 444 U. S. 646 (1980), with *Levitt* v. *Committee for Public Ed. & Religious Liberty*, 413 U. S. 472 (1973).[8] But

---

[8]The reason for such concern is not that the form *per se* is bad, but that such a form creates special risks that governmental aid will have the effect of advancing religion (or, even more, a purpose of doing so). An indirect form of payment reduces these risks. See *Mueller*, 463 U. S., at 399 (neutral tax deduction, because of its indirect form, allowed economic benefit to religious schools only as result of private choice and thus did not suggest state sanction of schools' religious messages). It is arguable, however, at least after *Witters* v. *Washington Dept. of Servs. for Blind*, 474 U. S. 481 (1986), that the principles of neutrality and private choice would be adequate to address those special risks, for it is hard to see the basis for deciding *Witters* differently simply if the State had sent the tuition check directly to whichever school Witters chose to attend. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 848 (1995) (O'CONNOR, J., concurring) (explaining *Witters* as reconciling principle of neutrality with principle against public funding of religious messages by relying on principle of private choice). Similarly, we doubt it would be unconstitutional if, to modify *Witters'* hypothetical, see 474 U. S., at 486–487; *supra*, at 816, a government employer directly sent a portion of an employee's paycheck to a religious institution designated by that employee pursuant to a neutral charitable program. We approved a similar arrangement in *Quick Bear*, 210 U. S., at 77–82, and the Federal Government appears to have long had such a program, see 1999 Catalog of Caring: Combined Federal Campaign of the National Capital Area 44, 45, 59, 74–75 (listing numerous religious organizations, many of which engage in religious education or in proselytizing, to which federal employees may contribute via payroll deductions); see generally *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788 (1985) (discussing Combined Federal Campaign). Finally, at least some of our prior cases striking down direct payments involved serious concerns about whether the payments were truly neutral. See, *e. g.*, *Committee for Public Ed. & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 762–764, 768, 774–780 (1973) (striking down, by 8-to-1 vote, program providing direct grants for maintenance and repair of school facilities, where payments were allocated per-pupil but were only

direct payments of money are not at issue in this case, and we refuse to allow a "special" case to create a rule for all cases.

2

Respondents also contend that the Establishment Clause requires that aid to religious schools not be impermissibly religious in nature or be divertible to religious use. We agree with the first part of this argument but not the second. Respondents' "no divertibility" rule is inconsistent with our more recent case law and is unworkable. So long as the governmental aid is not itself "unsuitable for use in the public schools because of religious content," *Allen, supra,* at 245, and eligibility for aid is determined in a constitutionally permissible manner, any use of that aid to indoctrinate cannot be attributed to the government and is thus not of constitutional concern. And, of course, the use to which the aid is put does not affect the criteria governing the aid's allocation and thus does not create any impermissible incentive under *Agostini*'s second criterion.

Our recent precedents, particularly *Zobrest,* require us to reject respondents' argument. For *Zobrest* gave no consideration to divertibility or even to actual diversion. Had such things mattered to the Court in *Zobrest,* we would have found the case to be quite easy—for *striking down* rather than, as we did, upholding the program—which is just how the dissent saw the case. See, *e. g.,* 509 U. S., at 18 (Blackmun, J., dissenting) ("Until now, the Court never has authorized a public employee to participate directly in religious indoctrination"); *id.,* at 22 ("[G]overnment crosses the boundary when it furnishes the medium for communication of a religious message. . . . [A] state-employed sign-language interpreter would serve as the conduit for James' religious education, thereby assisting Salpointe [High School] in its mission of religious indoctrination"); *id.,* at 23 (interpreter

available to private, nonprofit schools in low-income areas, "'all or practically all'" of which were Catholic). *Id.,* at 768.

"is likely to place the *imprimatur* of governmental approval upon the favored religion"); see generally *id.*, at 18–23. Quite clearly, then, we did not, as respondents do, think that the *use* of governmental aid to further religious indoctrination was synonymous with religious indoctrination *by* the government or that such use of aid created any improper incentives.

Similarly, had we, in *Witters*, been concerned with divertibility or diversion, we would have unhesitatingly, perhaps summarily, struck down the tuition-reimbursement program, because it was certain that Witters sought to participate in it to acquire an education in a religious career from a sectarian institution. Diversion was guaranteed. *Mueller* took the same view as *Zobrest* and *Witters*, for we did not in *Mueller* require the State to show that the tax deductions were only for the costs of education in secular subjects. We declined to impose any such segregation requirement for either the tuition-expense deductions or the deductions for items strikingly similar to those at issue in *Meek* and *Wolman*, and here. See *Mueller*, 463 U. S., at 391, n. 2; see also *id.*, at 414 (Marshall, J., dissenting) ("The instructional materials which are subsidized by the Minnesota tax deduction plainly may be used to inculcate religious values and belief").

JUSTICE O'CONNOR acknowledges that the Court in *Zobrest* and *Witters* approved programs that involved actual diversion. See *post*, at 841 (opinion concurring in judgment). The dissent likewise does not deny that *Witters* involved actual diversion. See *post*, at 895–896, n. 16. The dissent does claim that the aid in *Zobrest* "was not considered divertible," *post*, at 895, n. 16, but the dissent in *Zobrest*, which the author of today's dissent joined, understood the case otherwise. See *supra*, at 820. As that dissent made clear, diversion is the use of government aid to further a religious message. See *Zobrest, supra*, at 21–22 (Blackmun, J., dissenting); see also *post*, at 842, 857 (O'CONNOR, J., concurring in judgment). By that definition, the

government-provided interpreter in *Zobrest* was not only divertible, but actually diverted.

Respondents appear to rely on *Meek* and *Wolman* to establish their rule against "divertible" aid. But those cases offer little, if any, support for respondents. *Meek* mentioned divertibility only briefly in a concluding footnote, see 421 U. S., at 366, n. 16, and that mention was, at most, peripheral to the Court's reasoning in striking down the lending of instructional materials and equipment. The aid program in *Wolman* explicitly barred divertible aid, 433 U. S., at 248–249, so a concern for divertibility could not have been part of our reason for finding that program invalid.

The issue is not divertibility of aid but rather whether the aid itself has an impermissible content. Where the aid would be suitable for use in a public school, it is also suitable for use in any private school. Similarly, the prohibition against the government providing impermissible content resolves the Establishment Clause concerns that exist if aid is actually diverted to religious uses.[9] In *Agostini*, we explained *Zobrest* by making just this distinction between the content of aid and the use of that aid: "Because the only *government* aid in *Zobrest* was the interpreter, who was *herself not inculcating* any religious messages, no *government* indoctrination took place." 521 U. S., at 224 (second emphasis added). *Agostini* also acknowledged that what the dissenters in *Zobrest* had charged was essentially true: *Zobrest* did effect a "shift . . . in our Establishment Clause law." 521 U. S., at 225. The interpreter herself, assuming that she

[9] The dissent would find an establishment of religion if a government-provided projector were used in a religious school to show a privately purchased religious film, even though a public school that possessed the same kind of projector would likely be constitutionally barred from *refusing* to allow a student bible club to use that projector in a classroom to show the very same film, where the classrooms and projectors were generally available to student groups. See *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993).

fulfilled her assigned duties, see *id.*, at 224–225, had "no inherent religious significance," *Allen,* 392 U. S., at 244 (discussing bus rides in *Everson*), and so it did not matter (given the neutrality and private choice involved in the program) that she "would be a mouthpiece for religious instruction," *Agostini, supra,* at 226 (discussing *Zobrest*). And just as a government interpreter does not herself inculcate a religious message—even when she is conveying one—so also a government computer or overhead projector does not itself inculcate a religious message, even when it is conveying one.

In *Agostini* itself, we approved the provision of public employees to teach secular remedial classes in private schools partly because we concluded that there was no reason to suspect that indoctrinating content would be part of such governmental aid. See 521 U. S., at 223–225, 226–227, 234–235. Relying on *Zobrest*, we refused to presume that the public teachers would " 'inject religious content' " into their classes, 521 U. S., at 225, especially given certain safeguards that existed; we also saw no evidence that they had done so, *id.*, at 226–227.

In *Allen* we similarly focused on content, emphasizing that the textbooks were preapproved by public school authorities and were not "unsuitable for use in the public schools because of religious content." 392 U. S., at 245. See *Lemon,* 403 U. S., at 617 ("We note that the dissenters in *Allen* seemed chiefly concerned with the pragmatic difficulties involved in *ensuring the truly secular content* of the textbooks" (emphasis added)). Although it might appear that a book, because it has a pre-existing content, is not divertible, and thus that lack of divertibility motivated our holding in *Allen*, it is hard to imagine any book that could not, in even moderately skilled hands, serve to illustrate a religious message.[10] *Post*, at 855 (O'CONNOR, J., concurring in judgment)

---

[10] Although we did, elsewhere in *Board of Ed. of Central School Dist. No. 1 v. Allen*, 392 U. S. 236 (1968), observe, in response to a party's argument, that there was no evidence that the schools were using secular text-

(agreeing with this point). Indeed, the plaintiffs in *Walker* essentially conceded as much. 46 F. 3d, at 1469, n. 17. A teacher could, for example, easily use Shakespeare's King Lear, even though set in pagan times, to illustrate the Fourth Commandment. See Exodus 20:12 ("Honor your father and your mother"). Thus, it is a non sequitur for the dissent to contend that the textbooks in *Allen* were "not readily divertible to religious teaching purposes" because they "had a known and fixed secular content." *Post*, at 893–894.

A concern for divertibility, as opposed to improper content, is misplaced not only because it fails to explain why the sort of aid that we have allowed is permissible, but also because it is boundless—enveloping all aid, no matter how trivial—and thus has only the most attenuated (if any) link to any realistic concern for preventing an "establishment of religion." Presumably, for example, government-provided lecterns, chalk, crayons, pens, paper, and paintbrushes would have to be excluded from religious schools under respondents' proposed rule. But we fail to see how indoctrination by means of (*i. e.,* diversion of) such aid could be attributed to the government. In fact, the risk of improper attribution is *less* when the aid *lacks* content, for there is no risk (as there is with books) of the government inadvertently providing improper content. See *Allen, supra,* at 255–262 (Douglas, J., dissenting). Finally, *any* aid, with or without content, is "divertible" in the sense that it allows schools to "divert" resources. Yet we have " 'not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends.' " *Regan,* 444 U. S., at 658 (quoting *Hunt* v. *McNair,* 413 U. S. 734, 743 (1973)).

---

books to somehow further religious instruction, see *id.,* at 248, we had no occasion to say what the consequence would be were such use occurring and, more importantly, we think that this brief concluding comment cannot be read, especially after *Zobrest* (not to mention *Witters, Mueller,* and *Agostini*) as essential to the reasoning of *Allen.*

It is perhaps conceivable that courts could take upon themselves the task of distinguishing among the myriad kinds of possible aid based on the ease of diverting each kind. But it escapes us how a court might coherently draw any such line. It not only is far more workable, but also is actually related to real concerns about preventing advancement of religion by government, simply to require, as did *Zobrest*, *Agostini*, and *Allen*, that a program of aid to schools not provide improper content and that it determine eligibility and allocate the aid on a permissible basis.[11]

## C

The dissent serves up a smorgasbord of 11 factors that, depending on the facts of each case "in all its particularity," *post*, at 877, could be relevant to the constitutionality of a school-aid program. And those 11 are a bare minimum. We are reassured that there are likely more.[12] See *post*, at 885, 888. Presumably they will be revealed in future cases, as needed, but at least one additional factor is evident from the dissent itself: The dissent resurrects the concern for political divisiveness that once occupied the Court but that post-*Aguilar* cases have rightly disregarded. Compare *post*, at 868, 872, 901, 902, 909, n. 27, with *Agostini*, 521 U. S., at 233–234; *Bowen*, 487 U. S., at 617, n. 14; *Amos*, 483 U. S., at 339–340, n. 17. As JUSTICE O'CONNOR explained in dissent in *Aguilar*: "It is curious indeed to base our interpretation of the Constitution on speculation as to the likelihood of a phenomenon which the parties may create merely by

---

[11] JUSTICE O'CONNOR agrees that the Constitution does not bar divertible aid. See *post*, at 857 (opinion concurring in judgment). She also finds actual diversion unproblematic if "true private-choice" directs the aid. See *post*, at 842. And even when there is not such private choice, she thinks that some amount of actual diversion is tolerable and that safeguards for preventing and detecting actual diversion may be minimal, as we explain further, *infra*, at 832–834.

[12] It is thus surprising for the dissent to accuse us of following a rule of "breathtaking . . . manipulability." *Post*, at 901, n. 19.

prosecuting a lawsuit." 473 U. S., at 429. While the dissent delights in the perverse chaos that all these factors produce, *post*, at 899; see also *post*, at 869, 885, the Constitution becomes unnecessarily clouded, and legislators, litigants, and lower courts groan, as the history of this case amply demonstrates. See Part I–B, *supra*.

One of the dissent's factors deserves special mention: whether a school that receives aid (or whose students receive aid) is pervasively sectarian. The dissent is correct that there was a period when this factor mattered, particularly if the pervasively sectarian school was a primary or secondary school. *Post*, at 885–887, 894, 898, 902–906. But that period is one that the Court should regret, and it is thankfully long past.

There are numerous reasons to formally dispense with this factor. First, its relevance in our precedents is in sharp decline. Although our case law has consistently mentioned it even in recent years, we have not struck down an aid program in reliance on this factor since 1985, in *Aguilar* and *Ball*. *Agostini* of course overruled *Aguilar* in full and *Ball* in part, and today JUSTICE O'CONNOR distances herself from the part of *Ball* with which she previously agreed, by rejecting the distinction between public and private employees that was so prominent in *Agostini*. Compare *post*, at 858–860, 863–864 (opinion concurring in judgment), with *Agostini*, *supra*, at 223–225, 234–235. In *Witters*, a year after *Aguilar* and *Ball*, we did not ask whether the Inland Empire School of the Bible was pervasively sectarian. In *Bowen*, a 1988 decision, we refused to find facially invalid an aid program (although one not involving schools) whose recipients had, the District Court found, included pervasively sectarian institutions. See 487 U. S., at 636, 647, 648 (Blackmun, J., dissenting). Although we left it open on remand for the District Court to reaffirm its prior finding, we took pains to emphasize the narrowness of the "pervasively sectarian" category, see *id.*, at 620–621 (opinion of the Court), and two

Members of the majority questioned whether this category was "well-founded," *id.*, at 624 (KENNEDY, J., joined by SCALIA, J., concurring). Then, in *Zobrest* and *Agostini,* we upheld aid programs to children who attended schools that were not only pervasively sectarian but also were primary and secondary. *Zobrest,* in turning away a challenge based on the pervasively sectarian nature of Salpointe Catholic High School, emphasized the presence of private choice and the absence of government-provided sectarian content. 509 U. S., at 13. *Agostini,* in explaining why the aid program was constitutional, did not bother to mention that pervasively sectarian schools were at issue,[13] see 521 U. S., at 226–235, a fact that was not lost on the dissent, see *id.*, at 249 (opinion of SOUTER, J.). In disregarding the nature of the school, *Zobrest* and *Agostini* were merely returning to the approach of *Everson* and *Allen,* in which the Court upheld aid programs to students at pervasively sectarian schools. See *post,* at 875, 885–886 (SOUTER, J., dissenting) (noting this fact regarding *Everson*); *Allen,* 392 U. S., at 251–252 (Black, J., dissenting); *id.*, at 262–264, 269–270, n. (Douglas, J., dissenting).

Second, the religious nature of a recipient should not matter to the constitutional analysis, so long as the recipient adequately furthers the government's secular purpose. See *supra,* at 810. If a program offers permissible aid to the religious (including the pervasively sectarian), the areligious, and the irreligious, it is a mystery which view of religion the government has established, and thus a mystery what the constitutional violation would be. The pervasively sectarian recipient has not received any special favor, and it is most bizarre that the Court would, as the dissent seemingly does, reserve special hostility for those who take their religion seriously, who think that their religion should affect the whole

---

[13] Nor does JUSTICE O'CONNOR do so today in her analysis of Jefferson Parish's Chapter 2 program.

of their lives, or who make the mistake of being effective in transmitting their views to children.

Third, the inquiry into the recipient's religious views required by a focus on whether a school is pervasively sectarian is not only unnecessary but also offensive. It is well established, in numerous other contexts, that courts should refrain from trolling through a person's or institution's religious beliefs. See *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 887 (1990) (collecting cases). Yet that is just what this factor requires, as was evident before the District Court. Although the dissent welcomes such probing, see *post*, at 904–906, we find it profoundly troubling. In addition, and related, the application of the "pervasively sectarian" factor collides with our decisions that have prohibited governments from discriminating in the distribution of public benefits based upon religious status or sincerity. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995); *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993); *Widmar* v. *Vincent*, 454 U. S. 263 (1981).

Finally, hostility to aid to pervasively sectarian schools has a shameful pedigree that we do not hesitate to disavow. Cf. *Chicago* v. *Morales*, 527 U. S. 41, 53–54, n. 20 (1999) (plurality opinion). Although the dissent professes concern for "the implied exclusion of the less favored," *post*, at 868, the exclusion of pervasively sectarian schools from government-aid programs is just that, particularly given the history of such exclusion. Opposition to aid to "sectarian" schools acquired prominence in the 1870's with Congress' consideration (and near passage) of the Blaine Amendment, which would have amended the Constitution to bar any aid to sectarian institutions. Consideration of the amendment arose at a time of pervasive hostility to the Catholic Church and to Catholics in general, and it was an open secret that "sectarian" was code for "Catholic." See generally Green, The Blaine Amendment Reconsidered, 36 Am. J. Legal Hist. 38 (1992).

Notwithstanding its history, of course, "sectarian" could, on its face, describe the school of any religious sect, but the Court eliminated this possibility of confusion when, in *Hunt* v. *McNair*, 413 U. S., at 743, it coined the term "pervasively sectarian"—a term which, at that time, could be applied almost exclusively to Catholic parochial schools and which even today's dissent exemplifies chiefly by reference to such schools. See *post*, at 886, 904–906 (opinion of SOUTER, J.).

In short, nothing in the Establishment Clause requires the exclusion of pervasively sectarian schools from otherwise permissible aid programs, and other doctrines of this Court bar it. This doctrine, born of bigotry, should be buried now.

### III

Applying the two relevant *Agostini* criteria, we see no basis for concluding that Jefferson Parish's Chapter 2 program "has the effect of advancing religion." *Agostini, supra*, at 234. Chapter 2 does not result in governmental indoctrination, because it determines eligibility for aid neutrally, allocates that aid based on the private choices of the parents of schoolchildren, and does not provide aid that has an impermissible content. Nor does Chapter 2 define its recipients by reference to religion.

Taking the second criterion first, it is clear that Chapter 2 aid "is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Agostini*, 521 U. S., at 231. Aid is allocated based on enrollment: "Private schools receive Chapter 2 materials and equipment based on the per capita number of students at each school," *Walker*, 46 F. 3d, at 1464, and allocations to private schools must "be equal (consistent with the number of children to be served) to expenditures for programs under this subchapter for children enrolled in the public schools of the [LEA]," 20 U. S. C. § 7372(b). LEA's must provide Chapter 2 materials and equipment for the benefit

of children in private schools "[t]o the extent consistent with the number of children in the school district of [an LEA] . . . who are enrolled in private nonprofit elementary and secondary schools." § 7372(a)(1). See App. to Pet. for Cert. 87a (District Court, recounting testimony of head of Louisiana's Chapter 2 program that LEA's are told that "'for every dollar you spend for the public school student, you spend the same dollar for the non-public school student'"); §§ 7372(a)(1) and (b) (children in private schools must receive "equitable participation"). The allocation criteria therefore create no improper incentive. Chapter 2 does, by statute, deviate from a pure per capita basis for allocating aid to LEA's, increasing the per-pupil allocation based on the number of children within an LEA who are from poor families, reside in poor areas, or reside in rural areas. §§ 7312(a)–(b). But respondents have not contended, nor do we have any reason to think, that this deviation in the allocation *to* the LEA's leads to deviation in the allocation among schools *within* each LEA, see §§ 7372(a)–(b), and, even if it did, we would not presume that such a deviation created any incentive one way or the other with regard to religion.

Chapter 2 also satisfies the first *Agostini* criterion. The program makes a broad array of schools eligible for aid without regard to their religious affiliations or lack thereof. § 7372; see § 7353(a)(3). We therefore have no difficulty concluding that Chapter 2 is neutral with regard to religion. See *Agostini, supra,* at 225–226. Chapter 2 aid also, like the aid in *Agostini, Zobrest,* and *Witters,* reaches participating schools only "as a consequence of private decisionmaking." *Agostini, supra,* at 222. Private decisionmaking controls because of the per capita allocation scheme, and those decisions are independent because of the program's neutrality. See 521 U. S., at 226. It is the students and their parents—not the government—who, through their choice of school, determine who receives Chapter 2 funds. The aid follows the child.

Because Chapter 2 aid is provided pursuant to private choices, it is not problematic that one could fairly describe Chapter 2 as providing "direct" aid. The materials and equipment provided under Chapter 2 are presumably used from time to time by entire classes rather than by individual students (although individual students are likely the chief consumers of library books and, perhaps, of computers and computer software), and students themselves do not need to apply for Chapter 2 aid in order for their schools to receive it, but, as we explained in *Agostini*, these traits are not constitutionally significant or meaningful. See *id.*, at 228–229. Nor, for reasons we have already explained, is it of constitutional significance that the schools themselves, rather than the students, are the bailees of the Chapter 2 aid. The ultimate beneficiaries of Chapter 2 aid are the students who attend the schools that receive that aid, and this is so regardless of whether individual students lug computers to school each day or, as Jefferson Parish has more sensibly provided, the schools receive the computers. Like the Ninth Circuit, and unlike the dissent, *post*, at 888, we "see little difference in loaning science kits to students who then bring the kits to school as opposed to loaning science kits to the school directly." *Walker, supra*, at 1468, n. 16; see *Allen*, 392 U. S., at 244, n. 6.

Finally, Chapter 2 satisfies the first *Agostini* criterion because it does not provide to religious schools aid that has an impermissible content. The statute explicitly bars anything of the sort, providing that all Chapter 2 aid for the benefit of children in private schools shall be "secular, neutral, and nonideological," § 7372(a)(1), and the record indicates that the Louisiana SEA and the Jefferson Parish LEA have faithfully enforced this requirement insofar as relevant to this case. The chief aid at issue is computers, computer software, and library books. The computers presumably have no preexisting content, or at least none that would be impermissible for use in public schools. Respondents do not contend

otherwise. Respondents also offer no evidence that religious schools have received software from the government that has an impermissible content.

There is evidence that equipment has been, or at least easily could be, diverted for use in religious classes. See, e. g., App. 108a, 118a, 205a–207a. JUSTICE O'CONNOR, however, finds the safeguards against diversion adequate to prevent and detect actual diversion. Post, at 861, 867 (opinion concurring in judgment). The safeguards on which she relies reduce to three: (1) signed assurances that Chapter 2 aid will be used only for secular, neutral, and nonideological purposes, (2) monitoring visits, and (3) the requirement that equipment be labeled as belonging to Chapter 2.[14] As to the first, JUSTICE O'CONNOR rightly places little reliance on it. Post, at 862. As to the second, monitoring by SEA and LEA officials is highly unlikely to prevent or catch diversion.[15] As to the third, compliance with the labeling re-

---

[14] Many of the other safeguards on which JUSTICE O'CONNOR relies are safeguards against improper content, not against diversion. See post, at 862, 863 (opinion concurring in judgment). Content is a different matter from diversion and is much easier to police than is the mutable use of materials and equipment (which is one reason that we find the safeguards against improper content adequate, infra, at 834–835). Similarly, the statutory provisions against supplanting nonfederal funds and against paying federal funds for religious worship or instruction, on which JUSTICE O'CONNOR also relies, post, at 861, are of little, if any, relevance to diversion—the former because diversion need not supplant, and the latter because religious schools receive no funds, 20 U. S. C. § 7372(c)(1).

[15] The SEA director acknowledged as much when he said that the SEA enforces the rule against diversion "as best we can," only visits "[o]ne or two" of the private schools whenever it reviews an LEA, and reviews each LEA only once every three years. App. 94a–95a. When asked whether there was "any way" for SEA officials to know of diversion of a Chapter 2 computer, he responded, "No, there is no way." Id., at 118a. Monitoring by the Jefferson Parish LEA is similarly ineffective. The LEA visits each private school only once a year, for less than an hour and a half, and alerts the school to the visit in advance. Id., at 142a, 151a–152a, 182a–183a. The monitoring visits consist of reviewing records of equipment use and of speaking to a single contact person. Self-reporting is the sole source for the records of use. Id., at 140a. In the case of overhead

quirement is haphazard, see App. 113a, and, even if the requirement were followed, we fail to see how a label prevents diversion.[16]   In addition, we agree with the dissent that there is evidence of actual diversion and that, were the safeguards anything other than anemic, there would almost certainly be more such evidence.   See *post,* at 903, 906–910.[17]   In any event, for reasons we discussed in Part II–B–2,

projectors, the record appears to be just a sign-out sheet, and the LEA official simply checks whether "the recordation of use is attempted."   *Id.,* at 143a.   The contact person is not a teacher; monitoring does not include speaking with teachers; and the LEA makes no effort to inform teachers of the restrictions on use of Chapter 2 equipment.   *Id.,* at 154a–155a. The contact person also is usually not involved with the computers.   *Id.,* at 163a.   Thus, the contact person is uninvolved in the actual use of the divertible equipment and, therefore, in no position to know whether diversion has occurred.   See *id.,* at 154a.   Unsurprisingly, then, no contact person has ever reported diversion.   *Id.,* at 147a.   (In *Agostini,* by contrast, monitors visited each classroom—unannounced—once a month, and the teachers received specific training in what activities were permitted.   521 U. S., at 211–212, 234.)   The head of the Jefferson Parish LEA admitted that she had, and could have, no idea whether Chapter 2 equipment was being diverted:

"Q: Would there be any way to ascertain, from this on-site visit, whether the material or equipment purchased are used not only in accordance with Chapter 2 plan submitted, but for other purposes, also?

"A: No.

"Q: Now, would it be your view that a church-affiliated school that would teach the creation concept of the origin of man, that if they used [a Chapter 2] overhead projector, that would be a violation . . . ?

"A: Yes.

"Q: Now, is there any way, do you ever ask that question of a church-affiliated school, as to whether they use it for that purpose?

"A: No."   App. 144a, 150a–151a.

See *id.,* at 139a, 145a, 146a–147a (similar).

[16] In fact, a label, by associating the government with any religious use of the equipment, exacerbates any Establishment Clause problem that might exist when diversion occurs.

[17] JUSTICE O'CONNOR dismisses as *de minimis* the evidence of actual diversion.   *Post,* at 864–865 (opinion concurring in judgment).   That may be, but it is good to realize just what she considers *de minimis.*   There is

*supra,* the evidence of actual diversion and the weakness of the safeguards against actual diversion are not relevant to the constitutional inquiry, whatever relevance they may have under the statute and regulations.

Respondents do, however, point to some religious books that the LEA improperly allowed to be loaned to several religious schools, and they contend that the monitoring programs of the SEA and the Jefferson Parish LEA are insufficient to prevent such errors. The evidence, however, establishes just the opposite, for the improper lending of library books occurred—and was discovered and remedied—before this litigation began almost 15 years ago.[18] In other words, the monitoring system worked. See *post,* at 866 (O'CONNOR, J., concurring in judgment). Further, the violation by the LEA and the private schools was minor and, in the view of the SEA's coordinator, inadvertent. See App. 122a. There were approximately 191 improper book requests over three years (the 1982–1983 through 1984–1985 school years); these requests came from fewer than half of the 40 private schools then participating; and the cost of the 191 books

---

persuasive evidence that Chapter 2 audiovisual equipment was used in a Catholic school's theology department. "[M]uch" of the equipment at issue "was purchased with Federal funds," App. 205a, and those federal funds were, from the 1982–1983 school year on, almost certainly Chapter 2 funds, see *id.,* at 210a; cf. *id.,* at 187a, 189a. The diversion occurred over seven consecutive school years, *id.,* at 206a–207a, and the use of the equipment in the theology department was massive in each of those years, outstripping in every year use in other departments such as science, math, and foreign language, *ibid.* In addition, the dissent has documented likely diversion of computers. *Post,* at 910.

[18] The coordinator of the Jefferson Parish LEA ordered the books recalled sometime in the summer or early fall of 1985, and it appears that the schools had complied with the recall order by the second week of December 1985. App. 162a, 80a–81a. Respondents filed suit in early December. This self-correction is a key distinction between this instance of providing improper content and the evidence of actual diversion. See n. 17, *supra.*

amounted to "less than one percent of the total allocation over all those years." *Id.*, at 132a–133a.

The District Court found that prescreening by the LEA coordinator of requested library books was sufficient to prevent statutory violations, see App. to Pet. for Cert. 107a, and the Fifth Circuit did not disagree. Further, as noted, the monitoring system appears adequate to catch those errors that do occur. We are unwilling to elevate scattered *de minimis* statutory violations, discovered and remedied by the relevant authorities themselves prior to any litigation, to such a level as to convert an otherwise unobjectionable parishwide program into a law that has the effect of advancing religion.

IV

In short, Chapter 2 satisfies both the first and second primary criteria of *Agostini.* It therefore does not have the effect of advancing religion. For the same reason, Chapter 2 also "cannot reasonably be viewed as an endorsement of religion," *Agostini,* 521 U. S., at 235. Accordingly, we hold that Chapter 2 is not a law respecting an establishment of religion. Jefferson Parish need not exclude religious schools from its Chapter 2 program.[19] To the extent that *Meek* and *Wolman* conflict with this holding, we overrule them.

Our conclusion regarding *Meek* and *Wolman* should come as no surprise. The Court as early as *Wolman* itself left no doubt that *Meek* and *Allen* were irreconcilable, see 433 U. S., at 251, n. 18, and we have repeatedly reaffirmed *Allen* since then, see, *e. g., Agostini, supra,* at 231. (In fact, *Meek,* in

---

[19] Indeed, as petitioners observe, to require exclusion of religious schools from such a program would raise serious questions under the Free Exercise Clause. See, *e. g., Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 532 (1993) ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs"); *Everson,* 330 U. S., at 16; cf. *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819 (1996) (holding that Free Speech Clause bars exclusion of religious viewpoints from limited public forum).

discussing the materials-and-equipment program, did not even cite *Allen.* See *Meek,* 421 U. S., at 363–366.) Less than three years after *Wolman,* we explained that *Meek* did not, despite appearances, hold that "all loans of secular instructional material and equipment inescapably have the effect of direct advancement of religion." *Regan,* 444 U. S., at 661–662 (internal quotation marks omitted). Then, in *Mueller,* we conceded that the aid at issue in *Meek* and *Wolman* did "resembl[e], in many respects," the aid that we had upheld in *Everson* and *Allen.* 463 U. S., at 393, and n. 3; see *id.,* at 402, n. 10; see also *id.,* at 415 (Marshall, J., dissenting) (viewing *Allen* as incompatible with *Meek* and *Wolman,* and the distinction between textbooks and other instructional materials as "simply untenable"). Most recently, *Agostini,* in rejecting *Ball*'s assumption that "all government aid that directly assists the educational function of religious schools is invalid," *Agostini, supra,* at 225, necessarily rejected a large portion (perhaps all, see *Ball,* 473 U. S., at 395) of the reasoning of *Meek* and *Wolman* in invalidating the lending of materials and equipment, for *Ball* borrowed that assumption from those cases. See 521 U. S., at 220–221 (Shared Time program at issue in *Ball* was "surely invalid . . . [g]iven the holdings in *Meek* and *Wolman*" regarding instructional materials and equipment). Today we simply acknowledge what has long been evident and was evident to the Ninth and Fifth Circuits and to the District Court.

The judgment of the Fifth Circuit is reversed.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE BREYER joins, concurring in the judgment.

In 1965, Congress passed the Elementary and Secondary Education Act, 79 Stat. 27 (1965 Act). Under Title I, Congress provided monetary grants to States to address the needs of educationally deprived children of low-income families. Under Title II, Congress provided further monetary

grants to States for the acquisition of library resources, textbooks, and other instructional materials for use by children and teachers in public and private elementary and secondary schools. Since 1965, Congress has reauthorized the Title I and Title II programs several times. Three Terms ago, we held in *Agostini* v. *Felton,* 521 U. S. 203 (1997), that Title I, as applied in New York City, did not violate the Establishment Clause. I believe that *Agostini* likewise controls the constitutional inquiry respecting Title II presented here, and requires the reversal of the Court of Appeals' judgment that the program is unconstitutional as applied in Jefferson Parish, Louisiana. To the extent our decisions in *Meek* v. *Pittenger,* 421 U. S. 349 (1975), and *Wolman* v. *Walter,* 433 U. S. 229 (1977), are inconsistent with the Court's judgment today, I agree that those decisions should be overruled. I therefore concur in the judgment.

## I

I write separately because, in my view, the plurality announces a rule of unprecedented breadth for the evaluation of Establishment Clause challenges to government school aid programs. Reduced to its essentials, the plurality's rule states that government aid to religious schools does not have the effect of advancing religion so long as the aid is offered on a neutral basis and the aid is secular in content. The plurality also rejects the distinction between direct and indirect aid, and holds that the actual diversion of secular aid by a religious school to the advancement of its religious mission is permissible. Although the expansive scope of the plurality's rule is troubling, two specific aspects of the opinion compel me to write separately. First, the plurality's treatment of neutrality comes close to assigning that factor singular importance in the future adjudication of Establishment Clause challenges to government school aid programs. Second, the plurality's approval of actual diversion of government aid to religious indoctrination is in tension with our

precedents and, in any event, unnecessary to decide the instant case.

The clearest example of the plurality's near-absolute position with respect to neutrality is found in its following statement:

> "If the religious, irreligious, and areligious are all alike eligible for governmental aid, no one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government. For attribution of indoctrination is a relative question. If the government is offering assistance to recipients who provide, so to speak, a broad range of indoctrination, the government itself is not thought responsible for any particular indoctrination. To put the point differently, if the government, seeking to further some legitimate secular purpose, offers aid on the same terms, without regard to religion, to all who adequately further that purpose, then it is fair to say that any aid going to a religious recipient only has the effect of furthering that secular purpose." *Ante,* at 809–810 (citation omitted).

I agree with JUSTICE SOUTER that the plurality, by taking such a stance, "appears to take evenhandedness neutrality and in practical terms promote it to a single and sufficient test for the establishment constitutionality of school aid." *Post,* at 900 (dissenting opinion).

I do not quarrel with the plurality's recognition that neutrality is an important reason for upholding government-aid programs against Establishment Clause challenges. Our cases have described neutrality in precisely this manner, and we have emphasized a program's neutrality repeatedly in our decisions approving various forms of school aid. See, *e. g.,* *Agostini, supra,* at 228, 231–232; *Zobrest* v. *Catalina Foothills School Dist.,* 509 U. S. 1, 10 (1993); *Witters* v. *Washington Dept. of Servs. for Blind,* 474 U. S. 481, 487–488 (1986); *id.,* at 493 (O'CONNOR, J., concurring in part and concurring

in judgment); *Mueller* v. *Allen,* 463 U. S. 388, 397–399 (1983). Nevertheless, we have never held that a government-aid program passes constitutional muster *solely* because of the neutral criteria it employs as a basis for distributing aid. For example, in *Agostini,* neutrality was only one of several factors we considered in determining that New York City's Title I program did not have the impermissible effect of advancing religion. See 521 U. S., at 226–228 (noting lack of evidence of inculcation of religion by Title I instructors, legal requirement that Title I services be supplemental to regular curricula, and that no Title I funds reached religious schools' coffers). Indeed, given that the aid in *Agostini* had secular content and was distributed on the basis of wholly neutral criteria, our consideration of additional factors demonstrates that the plurality's rule does not accurately describe our recent Establishment Clause jurisprudence. See also *Zobrest, supra,* at 10, 12–13 (noting that no government funds reached religious school's coffers, aid did not relieve school of expense it otherwise would have assumed, and aid was not distributed to school but to the child).

JUSTICE SOUTER provides a comprehensive review of our Establishment Clause cases on government aid to religious institutions that is useful for its explanation of the various ways in which we have used the term "neutrality" in our decisions. See *post,* at 878–883. Even if we at one time used the term "neutrality" in a descriptive sense to refer to those aid programs characterized by the requisite equipoise between support of religion and antagonism to religion, JUSTICE SOUTER's discussion convincingly demonstrates that the evolution in the meaning of the term in our jurisprudence is cause to hesitate before equating the neutrality of recent decisions with the neutrality of old. As I have previously explained, neutrality is important, but it is by no means the only "axiom in the history and precedent of the Establishment Clause." *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819, 846 (1995) (concurring opinion). Thus,

I agree with JUSTICE SOUTER's conclusion that our "most recent use of 'neutrality' to refer to generality or evenhandedness of distribution . . . is relevant in judging whether a benefit scheme so characterized should be seen as aiding a sectarian school's religious mission, but this neutrality is not alone sufficient to qualify the aid as constitutional." *Post,* at 883–884.

I also disagree with the plurality's conclusion that actual diversion of government aid to religious indoctrination is consistent with the Establishment Clause. See *ante,* at 820–825. Although "[o]ur cases have permitted some government funding of secular functions performed by sectarian organizations," our decisions "provide no precedent for the use of public funds to finance religious activities." *Rosenberger, supra,* at 847 (O'CONNOR, J., concurring). At least two of the decisions at the heart of today's case demonstrate that we have long been concerned that secular government aid not be diverted to the advancement of religion. In both *Agostini,* our most recent school aid case, and *Board of Ed. of Central School Dist. No. 1* v. *Allen,* 392 U. S. 236 (1968), we rested our approval of the relevant programs in part on the fact that the aid had not been used to advance the religious missions of the recipient schools. See *Agostini, supra,* at 226–227 ("[N]o evidence has ever shown that any New York City Title I instructor teaching on parochial school premises attempted to inculcate religion in students"); *Allen, supra,* at 248 ("Nothing in this record supports the proposition that all textbooks, whether they deal with mathematics, physics, foreign languages, history, or literature, are used by the parochial schools to teach religion"). Of course, our focus on the lack of such evidence would have been entirely unnecessary if we had believed that the Establishment Clause permits the actual diversion of secular government aid to religious indoctrination. Our decision in *Bowen* v. *Kendrick,* 487 U. S. 589 (1988), also demonstrates that actual diversion is constitutionally impermissible. After conclud-

ing that the government-aid program in question was constitutional on its face, we remanded the case so that the District Court could determine, after further factual development, whether aid recipients had used the government aid to support their religious objectives. See *id.,* at 621–622; *id.,* at 624 (KENNEDY, J., concurring) ("[T]he only purpose of further inquiring whether any particular grantee institution is pervasively sectarian is as a preliminary step to demonstrating that the funds are in fact being used to further religion"). The remand would have been unnecessary if, as the plurality contends, actual diversion were irrelevant under the Establishment Clause.

The plurality bases its holding that actual diversion is permissible on *Witters* and *Zobrest. Ante,* at 820–821. Those decisions, however, rested on a significant factual premise missing from this case, as well as from the majority of cases thus far considered by the Court involving Establishment Clause challenges to school aid programs. Specifically, we decided *Witters* and *Zobrest* on the understanding that the aid was provided directly to the individual student who, in turn, made the choice of where to put that aid to use. See *Witters,* 474 U. S., at 488; *Zobrest,* 509 U. S., at 10, 12. Accordingly, our approval of the aid in both cases relied to a significant extent on the fact that "[a]ny aid . . . that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients." *Witters, supra,* at 487; see *Zobrest, supra,* at 10 ("[A] government-paid interpreter will be present in a sectarian school only as a result of the private decision of individual parents"). This characteristic of both programs made them less like a direct subsidy, which would be impermissible under the Establishment Clause, and more akin to the government issuing a paycheck to an employee who, in turn, donates a portion of that check to a religious institution. See, *e. g., Witters, supra,* at 486–487; see also *Rosenberger, supra,* at 848 (O'CONNOR, J., concurring) (discussing *Witters*).

Recognizing this distinction, the plurality nevertheless finds *Witters* and *Zobrest*—to the extent those decisions might permit the use of government aid for religious purposes—relevant in any case involving a neutral, per-capita-aid program. See *ante*, at 830–831. Like JUSTICE SOUTER, I do not believe that we should treat a per-capita-aid program the same as the true private-choice programs considered in *Witters* and *Zobrest*. See *post*, at 902. First, when the government provides aid directly to the student beneficiary, that student can attend a religious school and yet retain control over whether the secular government aid will be applied toward the religious education. The fact that aid flows to the religious school and is used for the advancement of religion is therefore *wholly* dependent on the student's private decision. See *Rosenberger*, 515 U. S., at 848 (O'CONNOR, J., concurring) (discussing importance of private choice in *Witters*); *Witters*, 474 U. S., at 488 ("[T]he fact that aid goes to individuals means that the decision to support religious education is made by the individual, not by the State"); *id.*, at 493 (O'CONNOR, J., concurring in part and concurring in judgment) ("The aid to religion at issue here is the result of petitioner's private choice"). It is for this reason that in *Agostini* we relied on *Witters* and *Zobrest* to reject the rule "that all government aid that directly assists the educational function of religious schools is invalid," 521 U. S., at 225, yet also rested our approval of New York City's Title I program in part on the lack of evidence of actual diversion, *id.*, at 226–227.

Second, I believe the distinction between a per capita school aid program and a true private-choice program is significant for purposes of endorsement. See, *e. g., Lynch* v. *Donnelly*, 465 U. S. 668, 692 (1984) (O'CONNOR, J., concurring). In terms of public perception, a government program of direct aid to religious schools based on the number of students attending each school differs meaningfully from the government distributing aid directly to individual students

who, in turn, decide to use the aid at the same religious schools. In the former example, if the religious school uses the aid to inculcate religion in its students, it is reasonable to say that the government has communicated a message of endorsement. Because the religious indoctrination is supported by government assistance, the reasonable observer would naturally perceive the aid program as *government* support for the advancement of religion. That the amount of aid received by the school is based on the school's enrollment does not separate the government from the endorsement of the religious message. The aid formula does not—and could not—indicate to a reasonable observer that the inculcation of religion is endorsed only by the individuals attending the religious school, who each affirmatively choose to direct the secular government aid to the school and its religious mission. No such choices have been made. In contrast, when government aid supports a school's religious mission only because of independent decisions made by numerous individuals to guide their secular aid to that school, "[n]o reasonable observer is likely to draw from the facts . . . an inference that the State itself is endorsing a religious practice or belief." *Witters, supra,* at 493 (O'CONNOR, J., concurring in part and concurring in judgment). Rather, endorsement of the religious message is reasonably attributed to the individuals who select the path of the aid.

Finally, the distinction between a per-capita-aid program and a true private-choice program is important when considering aid that consists of direct monetary subsidies. This Court has "recognized special Establishment Clause dangers where the government makes direct money payments to sectarian institutions." *Rosenberger,* 515 U. S., at 842; see also *ibid.* (collecting cases). If, as the plurality contends, a per-capita-aid program is identical in relevant constitutional respects to a true private-choice program, then there is no reason that, under the plurality's reasoning, the government should be precluded from providing direct money payments

to religious organizations (including churches) based on the number of persons belonging to each organization. And, because actual diversion is permissible under the plurality's holding, the participating religious organizations (including churches) could use that aid to support religious indoctrination. To be sure, the plurality does not actually hold that its theory extends to direct money payments. See *ante*, at 818–820. That omission, however, is of little comfort. In its logic—as well as its specific advisory language, see *ante*, at 819–820, n. 8—the plurality opinion foreshadows the approval of direct monetary subsidies to religious organizations, even when they use the money to advance their religious objectives.

Our school aid cases often pose difficult questions at the intersection of the neutrality and no-aid principles and therefore defy simple categorization under either rule. As I explained in *Rosenberger*, "[r]esolution instead depends on the hard task of judging—sifting through the details and determining whether the challenged program offends the Establishment Clause. Such judgment requires courts to draw lines, sometimes quite fine, based on the particular facts of each case." 515 U. S., at 847 (concurring opinion). *Agostini* represents our most recent attempt to devise a general framework for approaching questions concerning neutral school aid programs. *Agostini* also concerned an Establishment Clause challenge to a school aid program closely related to the one at issue here. For these reasons, as well as my disagreement with the plurality's approach, I would decide today's case by applying the criteria set forth in *Agostini*.

II

In *Agostini*, after reexamining our jurisprudence since *School Dist. of Grand Rapids* v. *Ball*, 473 U. S. 373 (1985), we explained that the general principles used to determine whether government aid violates the Establishment Clause have remained largely unchanged. 521 U. S., at 222. Thus,

we still ask "whether the government acted with the purpose of advancing or inhibiting religion" and "whether the aid has the 'effect' of advancing or inhibiting religion." *Id.*, at 222–223. We also concluded in *Agostini*, however, that the specific criteria used to determine whether government aid has an impermissible effect had changed. *Id.*, at 223. Looking to our recently decided cases, we articulated three primary criteria to guide the determination whether a government-aid program impermissibly advances religion: (1) whether the aid results in governmental indoctrination, (2) whether the aid program defines its recipients by reference to religion, and (3) whether the aid creates an excessive entanglement between government and religion. *Id.*, at 234. Finally, we noted that the same criteria could be reviewed to determine whether a government-aid program constitutes an endorsement of religion. *Id.*, at 235.

Respondents neither question the secular purpose of the Chapter 2 (Title II) program nor contend that it creates an excessive entanglement. (Due to its denomination as Chapter 2 of the Education Consolidation and Improvement Act of 1981, 95 Stat. 469, the parties refer to the 1965 Act's Title II program, as modified by subsequent legislation, as "Chapter 2." For ease of reference, I will do the same.) Accordingly, for purposes of deciding whether Chapter 2, as applied in Jefferson Parish, Louisiana, violates the Establishment Clause, we need ask only whether the program results in governmental indoctrination or defines its recipients by reference to religion.

Taking the second inquiry first, it is clear that Chapter 2 does not define aid recipients by reference to religion. In *Agostini*, we explained that scrutiny of the manner in which a government-aid program identifies its recipients is important because "the criteria might themselves have the effect of advancing religion by creating a financial incentive to undertake religious indoctrination." 521 U. S., at 231. We then clarified that this financial incentive is not present

"where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Ibid.* Under Chapter 2, the Secretary of Education allocates funds to the States based on each State's share of the Nation's school-age population. 20 U. S. C. § 7311(b). The state educational agency (SEA) of each recipient State, in turn, must distribute the State's Chapter 2 funds to local educational agencies (LEA's) "according to the relative enrollments in public and private, nonprofit schools within the school districts of such agencies," adjusted to take into account those LEA's "which have the greatest numbers or percentages of children whose education imposes a higher than average cost per child." § 7312(a). The LEA must then expend those funds on "innovative assistance programs" designed to improve student achievement. § 7351(b). The statute generally requires that an LEA ensure the "equitable participation" of children enrolled in private nonprofit elementary and secondary schools, § 7372(a)(1), and specifically mandates that all LEA expenditures on behalf of children enrolled in private schools "be equal (consistent with the number of children to be served) to expenditures for programs . . . for children enrolled in the public schools of the [LEA]," § 7372(b). As these statutory provisions make clear, Chapter 2 uses wholly neutral and secular criteria to allocate aid to students enrolled in religious and secular schools alike. As a result, it creates no financial incentive to undertake religious indoctrination.

*Agostini* next requires us to ask whether Chapter 2 "result[s] in governmental indoctrination." 521 U. S., at 234. Because this is a more complex inquiry under our case law, it is useful first to review briefly the basis for our decision in *Agostini* that New York City's Title I program did not result in governmental indoctrination. Under that program, public-school teachers provided Title I instruction to eligible

students on private school premises during regular school hours. Twelve years earlier, in *Aguilar* v. *Felton,* 473 U. S. 402 (1985), we had held the same New York City program unconstitutional. In *Ball,* a companion case to *Aguilar,* we also held that a similar program in Grand Rapids, Michigan, violated the Constitution. Our decisions in *Aguilar* and *Ball* were both based on a presumption, drawn in large part from *Meek,* see 421 U. S., at 367–373, that public-school instructors who teach secular classes on the campuses of religious schools will inevitably inculcate religion in their students.

In *Agostini,* we recognized that "[o]ur more recent cases [had] undermined the assumptions upon which *Ball* and *Aguilar* relied." 521 U. S., at 222. First, we explained that the Court had since abandoned "the presumption erected in *Meek* and *Ball* that the placement of public employees on parochial school grounds inevitably results in the impermissible effect of state-sponsored indoctrination or constitutes a symbolic union between government and religion." *Id.,* at 223. Rather, relying on *Zobrest,* we explained that in the absence of evidence showing that teachers were actually using the Title I aid to inculcate religion, we would presume that the instructors would comply with the program's secular restrictions. See *Agostini,* 521 U. S., at 223–224, 226–227. The Title I services were required by statute to be "'secular, neutral, and nonideological.'" *Id.,* at 210 (quoting 20 U. S. C. § 6321(a)(2)).

Second, we noted that the Court had "departed from the rule relied on in *Ball* that all government aid that directly assists the educational function of religious schools is invalid." *Agostini, supra,* at 225. Relying on *Witters* and *Zobrest,* we noted that our cases had taken a more forgiving view of neutral government programs that make aid available generally without regard to the religious or nonreligious character of the recipient school. See *Agostini,* 521 U. S., at 225–226. With respect to the specific Title I pro-

gram at issue, we noted several factors that precluded us from finding an impermissible financing of religious indoctrination: the aid was "provided to students at whatever school they choose to attend," the services were "by law supplemental to the regular curricula" of the benefited schools, "[n]o Title I funds ever reach the coffers of religious schools," and there was no evidence of Title I instructors having "attempted to inculcate religion in students." *Id.*, at 226–228. Relying on the same factors, we also concluded that the New York City program could not "reasonably be viewed as an endorsement of religion." *Id.*, at 235. Although we found it relevant that Title I services could not be provided on a schoolwide basis, we also explained that this fact was likely a sufficient rather than a necessary condition of the program's constitutionality. We were not "willing to conclude that the constitutionality of an aid program depends on the number of sectarian school students who happen to receive the otherwise neutral aid." *Id.*, at 229.

The Chapter 2 program at issue here bears the same hallmarks of the New York City Title I program that we found important in *Agostini.* First, as explained above, Chapter 2 aid is distributed on the basis of neutral, secular criteria. The aid is available to assist students regardless of whether they attend public or private nonprofit religious schools. Second, the statute requires participating SEA's and LEA's to use and allocate Chapter 2 funds only to supplement the funds otherwise available to a religious school. 20 U. S. C. § 7371(b). Chapter 2 funds must in no case be used to supplant funds from non-Federal sources. *Ibid.* Third, no Chapter 2 funds ever reach the coffers of a religious school. Like the Title I program considered in *Agostini*, all Chapter 2 funds are controlled by public agencies—the SEA's and LEA's. § 7372(c)(1). The LEA's purchase instructional and educational materials and then lend those materials to public and private schools. See §§ 7351(a), (b)(2). With respect to lending to private schools under Chapter 2, the statute

specifically provides that the relevant public agency must retain title to the materials and equipment. §7372(c)(1). Together with the supplantation restriction, this provision ensures that religious schools reap no financial benefit by virtue of receiving loans of materials and equipment. Finally, the statute provides that all Chapter 2 materials and equipment must be "secular, neutral, and nonideological." §7372(a)(1). That restriction is reinforced by a further statutory prohibition on "the making of any payment . . . for religious worship or instruction." §8897. Although respondents claim that Chapter 2 aid has been diverted to religious instruction, that evidence is *de minimis,* as I explain at greater length below. See *infra,* at 864–867.

### III

Respondents contend that *Agostini* is distinguishable, pointing to the distinct character of the aid program considered there. See Brief for Respondents 44–47. In *Agostini,* federal funds paid for public-school teachers to provide secular instruction to eligible children on the premises of their religious schools. Here, in contrast, federal funds pay for instructional materials and equipment that LEA's lend to religious schools for use by those schools' own teachers in their classes. Because we held similar programs unconstitutional in *Meek* and *Wolman,* respondents contend that those decisions, and not *Agostini,* are controlling. See, *e. g.,* Brief for Respondents 11, 22–25. Like respondents, JUSTICE SOUTER also relies on *Meek* and *Wolman* in finding the character of the Chapter 2 aid constitutionally problematic. See *post,* at 893, 903.

At the time they were decided, *Meek* and *Wolman* created an inexplicable rift within our Establishment Clause jurisprudence concerning government aid to schools. Seven years before our decision in *Meek,* we held in *Allen* that a New York statute that authorized the lending of textbooks to students attending religious schools did not violate the

Establishment Clause. 392 U. S., at 238. We explained that the statute "merely [made] available to all children the benefits of a general program to lend school books free of charge," that the State retained ownership of the textbooks, and that religious schools received no financial benefit from the program. *Id.*, at 243–244. We specifically rejected the contrary argument that the statute violated the Establishment Clause because textbooks are critical to the teaching process, which in a religious school is employed to inculcate religion. *Id.*, at 245–248.

In *Meek* and *Wolman,* we adhered to *Allen,* holding that the textbook lending programs at issue in each case did not violate the Establishment Clause. See *Meek,* 421 U. S., at 359–362 (plurality opinion); *Wolman,* 433 U. S., at 236–238 (plurality opinion). At the same time, however, we held in both cases that the lending of instructional materials and equipment to religious schools was unconstitutional. See *Meek, supra,* at 362–366; *Wolman, supra,* at 248–251. We reasoned that, because the religious schools receiving the materials and equipment were pervasively sectarian, any assistance in support of the schools' educational missions would inevitably have the impermissible effect of advancing religion. For example, in *Meek* we explained:

> "[I]t would simply ignore reality to attempt to separate secular educational functions from the predominantly religious role performed by many of Pennsylvania's church-related elementary and secondary schools and to then characterize [the statute] as channeling aid to the secular without providing direct aid to the sectarian. Even though earmarked for secular purposes, 'when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission,' state aid has the impermissible primary effect of advancing religion." 421 U. S., at 365–366 (quoting *Hunt* v. *McNair,* 413 U. S. 734, 743 (1973)).

Thus, we held that the aid program *"necessarily results* in aid to the sectarian school enterprise as a whole," and *"inescapably results* in the direct and substantial advancement of religious activity." *Meek, supra,* at 366 (emphases added). Similarly, in *Wolman,* we concluded that, "[i]n view of the impossibility of separating the secular education function from the sectarian, the state aid *inevitably flows* in part in support of the religious role of the schools." 433 U. S., at 250 (emphasis added).

For whatever reason, the Court was not willing to extend this presumption of inevitable religious indoctrination to school aid when it instead consisted of textbooks lent free of charge. For example, in *Meek,* despite identifying the religious schools' secular educational functions and religious missions as inextricably intertwined, 421 U. S., at 366, the Court upheld the textbook lending program because "the record in the case . . . , like the record in *Allen,* contains no suggestion that religious textbooks will be lent or that the books provided will be used for anything other than purely secular purposes," *id.,* at 361–362 (citation omitted). Accordingly, while the Court was willing to apply an irrebuttable presumption that secular instructional materials and equipment would be diverted to use for religious indoctrination, it required evidence that religious schools were diverting secular textbooks to religious instruction.

The inconsistency between the two strands of the Court's jurisprudence did not go unnoticed, as Justices on both sides of the *Meek* and *Wolman* decisions relied on the contradiction to support their respective arguments. See, *e. g., Meek,* 421 U. S., at 384 (Brennan, J., concurring in part and dissenting in part) ("[W]hat the Court says of the instructional materials and equipment may be said perhaps even more accurately of the textbooks" (citation omitted)); *id.,* at 390 (REHNQUIST, J., concurring in judgment in part and dissenting in part) ("The failure of the majority to justify the differing approaches to textbooks and instructional materials and

equipment in the above respect is symptomatic of its failure even to attempt to distinguish the . . . textbook loan program, which the plurality upholds, from the . . . instructional materials and equipment loan program, which the majority finds unconstitutional"). The irrationality of this distinction is patent. As one Member of our Court has noted, it has meant that "a State may lend to parochial school children geography textbooks that contain maps of the United States, but the State may not lend maps of the United States for use in geography class." *Wallace* v. *Jaffree,* 472 U. S. 38, 110 (1985) (REHNQUIST, J., dissenting) (footnotes omitted).

Indeed, technology's advance since the *Allen, Meek,* and *Wolman* decisions has only made the distinction between textbooks and instructional materials and equipment more suspect. In this case, for example, we are asked to draw a constitutional line between lending textbooks and lending computers. Because computers constitute instructional equipment, adherence to *Meek* and *Wolman* would require the exclusion of computers from any government school aid program that includes religious schools. Yet, computers are now as necessary as were schoolbooks 30 years ago, and they play a somewhat similar role in the educational process. That *Allen, Meek,* and *Wolman* would permit the constitutionality of a school aid program to turn on whether the aid took the form of a computer rather than a book further reveals the inconsistency inherent in their logic.

Respondents insist that there is a reasoned basis under the Establishment Clause for the distinction between textbooks and instructional materials and equipment. They claim that the presumption that religious schools will use instructional materials and equipment to inculcate religion is sound because such materials and equipment, unlike textbooks, are reasonably divertible to religious uses. For example, no matter what secular criteria the government employs in selecting a film projector to lend to a religious school, school officials can always divert that projector to re-

ligious instruction. Respondents therefore claim that the Establishment Clause prohibits the government from giving or lending aid to religious schools when that aid is reasonably divertible to religious uses. See, *e. g.*, Brief for Respondents 11, 35. JUSTICE SOUTER also states that the divertibility of secular government aid is an important consideration under the Establishment Clause, although he apparently would not ascribe it the constitutionally determinative status that respondents do. See *post*, at 885, 890–895.

I would reject respondents' proposed divertibility rule. First, respondents cite no precedent of this Court that would require it. The only possible direct precedential support for such a rule is a single sentence contained in a footnote from our *Wolman* decision. There, the Court described *Allen* as having been "premised on the view that the educational content of textbooks is something that can be ascertained in advance and cannot be diverted to sectarian uses." *Wolman, supra*, at 251, n. 18. To the extent this simple description of *Allen* is even correct, it certainly does not constitute an actual holding that the Establishment Clause prohibits the government from lending any divertible aid to religious schools. Rather, as explained above, the *Wolman* Court based its holding invalidating the lending of instructional materials and equipment to religious schools on the rationale adopted in *Meek*—that the secular educational function of a religious school is inseparable from its religious mission. See *Wolman*, 433 U. S., at 250. Indeed, if anything, the *Wolman* footnote confirms the irrationality of the distinction between textbooks and instructional materials and equipment. After the *Wolman* Court acknowledged that its holding with respect to instructional materials and equipment was in tension with *Allen*, the Court explained the continuing validity of *Allen* solely on the basis of *stare decisis: "Board of Education* v. *Allen* has remained law, and we now follow as a matter of *stare decisis* the principle that restriction of textbooks to those provided the public schools is sufficient to ensure

that the books will not be used for religious purposes." *Wolman, supra,* at 252, n. 18. Thus, the *Wolman* Court never justified the inconsistent treatment it accorded the lending of textbooks and the lending of instructional materials and equipment based on the items' reasonable divertibility.

JUSTICE SOUTER's attempt to defend the divertibility rationale as a viable distinction in our Establishment Clause jurisprudence fares no better. For JUSTICE SOUTER, secular school aid presents constitutional problems not only when it is actually diverted to religious ends, but also when it simply has the capacity for, or presents the possibility of, such diversion. See, *e. g., post,* at 893 (discussing "susceptibility [of secular supplies] to the service of religious ends"). Thus, he explains the *Allen, Meek,* and *Wolman* decisions as follows: "While the textbooks had a known and fixed secular content not readily divertible to religious teaching purposes, the adaptable materials did not." *Post,* at 893–894. This view would have come as a surprise to the Court in *Meek,* which expressly conceded that "the material and equipment that are the subjects of the loan . . . are 'self-polic[ing], in that starting as secular, nonideological and neutral, they will not change in use.'" 421 U. S., at 365 (quoting *Meek* v. *Pittenger,* 374 F. Supp. 639, 660 (ED Pa. 1974)). Indeed, given the nature of the instructional materials considered in *Meek* and *Wolman,* it is difficult to comprehend how a divertibility rationale could have explained the decisions. The statutes at issue in those cases authorized the lending of "periodicals, photographs, maps, charts, sound recordings, [and] films," *Meek, supra,* at 355, and "maps and globes," *Wolman, supra,* at 249. There is no plausible basis for saying that these items are somehow more divertible than a textbook given that each of the above items, like a textbook, has a fixed and ascertainable content.

In any event, even if *Meek* and *Wolman* had articulated the divertibility rationale urged by respondents and JUSTICE

SOUTER, I would still reject it for a more fundamental reason. Stated simply, the theory does not provide a logical distinction between the lending of textbooks and the lending of instructional materials and equipment. An educator can use virtually any instructional tool, whether it has ascertainable content or not, to teach a religious message. In this respect, I agree with the plurality that "it is hard to imagine any book that could not, in even moderately skilled hands, serve to illustrate a religious message." *Ante*, at 823. In today's case, for example, we are asked to draw a constitutional distinction between lending a textbook and lending a library book. JUSTICE SOUTER's try at justifying that distinction only demonstrates the absurdity on which such a difference must rest. He states that "[a]lthough library books, like textbooks, have fixed content, religious teachers can assign secular library books for religious critique." *Post*, at 903. Regardless of whether that explanation is even correct (for a student surely could be given a religious assignment in connection with a textbook too), it is hardly a distinction on which constitutional law should turn. Moreover, if the mere ability of a teacher to devise a religious lesson involving the secular aid in question suffices to hold the provision of that aid unconstitutional, it is difficult to discern any limiting principle to the divertibility rule. For example, even a publicly financed lunch would apparently be unconstitutional under a divertibility rationale because religious school officials conceivably could use the lunch to lead the students in a blessing over the bread. See Brief for Avi Chai Foundation as *Amicus Curiae* 18.

To the extent JUSTICE SOUTER believes several related Establishment Clause decisions require application of a divertibility rule in the context of this case, I respectfully disagree. JUSTICE SOUTER is correct to note our continued recognition of the special dangers associated with direct money grants to religious institutions. See *post*, at 890–893. It does not follow, however, that we should treat as constitu-

tionally suspect any form of secular aid that might conceivably be diverted to a religious use. As the cases JUSTICE SOUTER cites demonstrate, our concern with direct monetary aid is based on more than just diversion. In fact, the most important reason for according special treatment to direct money grants is that this form of aid falls precariously close to the original object of the Establishment Clause's prohibition. See, e. g., *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 668 (1970) ("[F]or the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity"). Statements concerning the constitutionally suspect status of direct cash aid, accordingly, provide no justification for applying an absolute rule against divertibility when the aid consists instead of instructional materials and equipment.

JUSTICE SOUTER also relies on our decisions in *Wolman* (to the extent it concerned field-trip transportation for non-public schools), *Levitt* v. *Committee for Public Ed. & Religious Liberty*, 413 U. S. 472 (1973), *Tilton* v. *Richardson*, 403 U. S. 672 (1971), and *Bowen*. See *post*, at 893–895. None requires application of a divertibility rule in the context of this case. *Wolman* and *Levitt* were both based on the same presumption that government aid will be used in the inculcation of religion that we have chosen not to apply to textbook lending programs and that we have more generally rejected in recent decisions. Compare *Wolman*, 433 U. S., at 254; *Levitt, supra*, at 480, with *supra*, at 851–852; *infra*, at 859. In *Tilton*, we considered a federal statute that authorized grants to universities for the construction of buildings and facilities to be used exclusively for secular educational purposes. See 403 U. S., at 674–675. We held the statute unconstitutional only to the extent that a university's "obligation not to use the facility for sectarian instruction or religious worship . . . appear[ed] to expire at the end of 20 years." *Id.*, at 683. To hold a statute unconstitutional because it lacks a secular content restriction is quite different

from resting on a divertibility rationale. Indeed, the fact that we held the statute constitutional in all other respects is more probative on the divertibility question because it demonstrates our willingness to presume that the university would abide by the secular content restriction during the years the requirement was in effect. In any event, Chapter 2 contains both a secular content restriction, 20 U. S. C. § 7372(a)(1), and a prohibition on the use of aid for religious worship or instruction, § 8897, so *Tilton* provides no basis for upholding respondents' challenge. Finally, our decision in *Bowen* proves only that actual diversion, as opposed to mere divertibility, is constitutionally impermissible. See, *e. g.*, 487 U. S., at 621. Had we believed that the divertibility of secular aid was sufficient to call the aid program into question, there would have been no need for the remand we ordered and no basis for the reversal.

## IV

Because divertibility fails to explain the distinction our cases have drawn between textbooks and instructional materials and equipment, there remains the question of which of the two irreconcilable strands of our Establishment Clause jurisprudence we should now follow. Between the two, I would adhere to the rule that we have applied in the context of textbook lending programs: To establish a First Amendment violation, plaintiffs must prove that the aid in question actually is, or has been, used for religious purposes. See *Meek*, 421 U. S., at 361–362; *Allen*, 392 U. S., at 248. Just as we held in *Agostini* that our more recent cases had undermined the assumptions underlying *Ball* and *Aguilar*, I would now hold that *Agostini* and the cases on which it relied have undermined the assumptions underlying *Meek* and *Wolman*. To be sure, *Agostini* only addressed the specific presumption that public-school employees teaching on the premises of religious schools would inevitably inculcate religion. Nevertheless, I believe that our definitive rejection of that presumption also stood for—or at least strongly

pointed to—the broader proposition that such presumptions of religious indoctrination are normally inappropriate when evaluating neutral school aid programs under the Establishment Clause. In *Agostini,* we repeatedly emphasized that it would be inappropriate to presume inculcation of religion; rather, plaintiffs raising an Establishment Clause challenge must present evidence that the government aid in question has resulted in religious indoctrination. See 521 U. S., at 223–224, 226–227. We specifically relied on our statement in *Zobrest* that a presumption of indoctrination, because it constitutes an absolute bar to the aid in question regardless of the religious school's ability to separate that aid from its religious mission, constitutes a "flat rule, smacking of antiquated notions of 'taint,' [that] would indeed exalt form over substance." 509 U. S., at 13. That reasoning applies with equal force to the presumption in *Meek* and *Ball* concerning instructional materials and equipment. As we explained in *Agostini,* "we have departed from the rule relied on in *Ball* that all government aid that directly assists the educational function of religious schools is invalid." 521 U. S., at 225.

Respondents contend that *Agostini* should be limited to its facts, and point specifically to the following statement from my separate opinion in *Ball* as the basis for retaining a presumption of religious inculcation for instructional materials and equipment:

> "When full-time parochial school teachers receive public funds to teach secular courses to their parochial school students under parochial school supervision, I agree that the program has the perceived and actual effect of advancing the religious aims of the church-related schools. This is particularly the case where, as here, religion pervades the curriculum and the teachers are accustomed to bring religion to play in everything they teach." 473 U. S., at 399–400 (concurring in judgment in part and dissenting in part).

Respondents note that in *Agostini* we did not overrule that portion of *Ball* holding the Community Education program unconstitutional. Under that program, the government paid religious school teachers to operate as part-time public teachers at their religious schools by teaching secular classes at the conclusion of the regular schoolday. *Ball,* 473 U. S., at 376–377. Relying on both the majority opinion and my separate opinion in *Ball,* respondents therefore contend that we must presume that religious school teachers will inculcate religion in their students. If that is so, they argue, we must also presume that religious school teachers will be unable to follow secular restrictions on the use of instructional materials and equipment lent to their schools by the government. See Brief for Respondents 26–29.

I disagree, however, that the latter proposition follows from the former. First, as our holding in *Allen* and its reaffirmance in *Meek* and *Wolman* demonstrate, the Court's willingness to assume that religious school instructors will inculcate religion has not caused us to presume also that such instructors will be unable to follow secular restrictions on the use of textbooks. I would similarly reject any such presumption regarding the use of instructional materials and equipment. When a religious school receives textbooks or instructional materials and equipment lent with secular restrictions, the school's teachers need not refrain from teaching religion altogether. Rather, the instructors need only ensure that any such religious teaching is done without the instructional aids provided by the government. We have always been willing to assume that religious school instructors can abide by such restrictions when the aid consists of textbooks, which Justice Brennan described as "surely the heart tools of . . . education." *Meek, supra,* at 384 (concurring in part and dissenting in part). The same assumption should extend to instructional materials and equipment.

For the same reason, my position in *Ball* is distinguishable. There, the government paid for religious school instructors

to teach classes supplemental to those offered during the normal schoolday. In that context, I was willing to presume that the religious school teacher who works throughout the day to advance the school's religious mission would also do so, at least to some extent, during the supplemental classes provided at the end of the day. Because the government financed the entirety of such classes, any religious indoctrination taking place therein would be directly attributable to the government. In the instant case, because the Chapter 2 aid concerns only teaching tools that must remain supplementary, the aid constitutes only a portion of the teacher's educational efforts during any single class. In this context, I find it easier to believe that a religious school teacher can abide by the secular restrictions placed on the government assistance. I therefore would not presume that the Chapter 2 aid will advance, or be perceived to advance, the school's religious mission.

V

Respondents do not rest, however, on their divertibility argument alone. Rather, they also contend that the evidence respecting the actual administration of Chapter 2 in Jefferson Parish demonstrates that the program violated the Establishment Clause. First, respondents claim that the program's safeguards are insufficient to uncover instances of actual diversion. Brief for Respondents 37, 42–43, 45–47. Second, they contend that the record shows that some religious schools in Jefferson Parish may have used their Chapter 2 aid to support religious education (i. e., that they diverted the aid). Id., at 36–37. Third, respondents highlight violations of Chapter 2's secular content restrictions. Id., at 39–41. And, finally, they note isolated examples of potential violations of Chapter 2's supplantation restriction. Id., at 43–44. Based on the evidence underlying the first and second claims, the plurality appears to contend that the Chapter 2 program can be upheld only if actual diversion of government aid to the advancement of religion

is permissible under the Establishment Clause. See *ante*, at 832–834. Relying on the evidence underlying all but the last of the above claims, JUSTICE SOUTER concludes that the Chapter 2 program, as applied in Jefferson Parish, violated the Establishment Clause. See *post*, at 902–910. I disagree with both the plurality and JUSTICE SOUTER. The limited evidence amassed by respondents during 4 years of discovery (which began approximately 15 years ago) is at best *de minimis* and therefore insufficient to affect the constitutional inquiry.

The plurality and JUSTICE SOUTER direct the primary thrust of their arguments at the alleged inadequacy of the program's safeguards. Respondents, the plurality, and JUSTICE SOUTER all appear to proceed from the premise that, so long as actual diversion presents a constitutional problem, the government must have a failsafe mechanism capable of detecting *any* instance of diversion. We rejected that very assumption, however, in *Agostini*. There, we explained that because we had "abandoned the assumption that properly instructed public employees will fail to discharge their duties faithfully, we must also discard the assumption that *pervasive* monitoring of Title I teachers is required." 521 U. S., at 234 (emphasis in original). Because I believe that the Court should abandon the presumption adopted in *Meek* and *Wolman* respecting the use of instructional materials and equipment by religious school teachers, I see no constitutional need for *pervasive* monitoring under the Chapter 2 program.

The safeguards employed by the program are constitutionally sufficient. At the federal level, the statute limits aid to "secular, neutral, and nonideological services, materials, and equipment," 20 U. S. C. § 7372(a)(1); requires that the aid only supplement and not supplant funds from non-Federal sources, § 7371(b); and prohibits "any payment . . . for religious worship or instruction," § 8897. At the state level, the Louisiana Department of Education (the relevant SEA for

Louisiana) requires all nonpublic schools to submit signed assurances that they will use Chapter 2 aid only to supplement and not to supplant non-Federal funds, and that the instructional materials and equipment "will only be used for secular, neutral and nonideological purposes." App. 260a–261a; see also *id.*, at 120a. Although there is some dispute concerning the mandatory nature of these assurances, Dan Lewis, the director of Louisiana's Chapter 2 program, testified that all of the State's nonpublic schools had thus far been willing to sign the assurances, and that the State retained the power to cut off aid to any school that breached an assurance. *Id.*, at 122a–123a. The Louisiana SEA also conducts monitoring visits to each of the State's LEA's—and one or two of the nonpublic schools covered by the relevant LEA— once every three years. *Id.*, at 95a–96a. In addition to other tasks performed on such visits, SEA representatives conduct a random review of a school's library books for religious content. *Id.*, at 99a.

At the local level, the Jefferson Parish Public School System (JPPSS) requires nonpublic schools seeking Chapter 2 aid to submit applications, complete with specific project plans, for approval. *Id.*, at 127a; *id.*, at 194a–203a (sample application). The JPPSS then conducts annual monitoring visits to each of the nonpublic schools receiving Chapter 2 aid. *Id.*, at 141a–142a. On each visit, a JPPSS representative meets with a contact person from the nonpublic school and reviews with that person the school's project plan and the manner in which the school has used the Chapter 2 materials and equipment to support its plan. *Id.*, at 142a, 149a. The JPPSS representative also reminds the contact person of the prohibition on the use of Chapter 2 aid for religious purposes, *id.*, at 149a, and conducts a random sample of the school's Chapter 2 materials and equipment to ensure that they are appropriately labeled and that the school has maintained a record of their usage, *id.*, at 142a–144a. (Although the plurality and JUSTICE SOUTER claim that compliance

with the labeling requirement was haphazard, both cite only a statewide monitoring report that includes no specific findings with respect to Jefferson Parish. *Ante*, at 832–833 (citing App. 113a); *post*, at 906 (same).) Finally, the JPPSS representative randomly selects library books the nonpublic school has acquired through Chapter 2 and reviews their content to ensure that they comply with the program's secular content restriction. App. 210a. If the monitoring does not satisfy the JPPSS representative, another visit is scheduled. *Id.*, at 151a–152a. Apart from conducting monitoring visits, the JPPSS reviews Chapter 2 requests filed by participating nonpublic schools. As part of this process, a JPPSS employee examines the titles of requested library books and rejects any book whose title reveals (or suggests) a religious subject matter. *Id.*, at 135a, 137a–138a. As the above description of the JPPSS monitoring process should make clear, JUSTICE SOUTER's citation of a statewide report finding a lack of monitoring in some Louisiana LEA's is irrelevant as far as Jefferson Parish is concerned. See *post*, at 906 (quoting App. 111a).

Respondents, the plurality, and JUSTICE SOUTER all fault the above-described safeguards primarily because they depend on the good faith of participating religious school officials. For example, both the plurality and JUSTICE SOUTER repeatedly cite testimony by state and parish officials acknowledging that the safeguards depend to a certain extent on the religious schools' self-reporting and that, therefore, there is no way for the State or Jefferson Parish to say definitively that no Chapter 2 aid is diverted to religious purposes. See, *e. g., ante*, at 832–833, n. 15; *post*, at 906–907. These admissions, however, do not prove that the safeguards are inadequate. To find that actual diversion will flourish, one must presume bad faith on the part of the religious school officials who report to the JPPSS monitors regarding the use of Chapter 2 aid. I disagree with the plurality and JUSTICE SOUTER on this point and believe that it is entirely

proper to presume that these school officials will act in good faith. That presumption is especially appropriate in this case, since there is no proof that religious school officials have breached their schools' assurances or failed to tell government officials the truth. Cf. *Tilton*, 403 U. S., at 679 ("A possibility always exists, of course, that the legitimate objectives of any law or legislative program may be subverted by conscious design or lax enforcement. . . . But judicial concern about these possibilities cannot, standing alone, warrant striking down a statute as unconstitutional").

The evidence proffered by respondents, and relied on by the plurality and JUSTICE SOUTER, concerning actual diversion of Chapter 2 aid in Jefferson Parish is *de minimis*. Respondents first cite the following statement from a Jefferson Parish religious school teacher: "Audio-visual materials are a very necessary and enjoyable tool used when teaching young children. As a second grade teacher I use them in all subjects and see a very positive result." App. 108a. Respondents' only other evidence consists of a chart concerning one Jefferson Parish religious school, which shows that the school's theology department was a significant user of audio-visual equipment. See *id.*, at 206a–208a. Although an accompanying letter indicates that much of the school's equipment was purchased with federal funds, *id.*, at 205a, the chart does not provide a breakdown identifying specific Chapter 2 usage. Indeed, unless we are to relieve respondents of their evidentiary burden and presume a violation of Chapter 2, we should assume that the school used its own equipment in the theology department and the Chapter 2 equipment elsewhere. The more basic point, however, is that neither piece of evidence demonstrates that Chapter 2 aid actually was diverted to religious education. At most, it proves the possibility that, out of the more than 40 nonpublic schools in Jefferson Parish participating in Chapter 2, aid may have been diverted in one school's second-grade class and another school's theology department.

The plurality's insistence that this evidence is somehow substantial flatly contradicts its willingness to disregard similarly insignificant evidence of violations of Chapter 2's supplantation and secular content restrictions. See *ante*, at 815, n. 7 (finding no "material statutory violation" of the supplantation restriction); *ante*, at 835 (characterizing violations of secular content restriction as "scattered" and "*de minimis*"). As I shall explain below, I believe the evidence on all three points is equally insignificant and, therefore, should be treated the same.

JUSTICE SOUTER also relies on testimony by one religious school principal indicating that a computer lent to her school under Chapter 2 was connected through a network to non-Chapter 2 computers. See *post*, at 910 (citing App. 77a). The principal testified that the Chapter 2 computer would take over the network if another non-Chapter 2 computer were to break down. *Ibid.* To the extent the principal's testimony even proves that Chapter 2 funds were diverted to the school's religious mission, the evidence is hardly compelling.

JUSTICE SOUTER contends that *any* evidence of actual diversion requires the Court to declare the Chapter 2 program unconstitutional as applied in Jefferson Parish. *Post*, at 909, n. 27. For support, he quotes my concurring opinion in *Bowen* and the statement therein that "*any* use of public funds to promote religious doctrines violates the Establishment Clause." 487 U. S., at 623 (emphasis in original). That principle of course remains good law, but the next sentence in my opinion is more relevant to the case at hand: "*[E]xtensive* violations—if they can be proved in this case— will be highly relevant in shaping an appropriate remedy that ends such abuses." *Ibid.* (emphasis in original). I know of no case in which we have declared an entire aid program unconstitutional on Establishment Clause grounds solely because of violations on the minuscule scale of those at issue here. Yet that is precisely the remedy respondents

requested from the District Court and that they were granted by the Court of Appeals. See App. 51a; *Helms* v. *Picard,* 151 F. 3d 347, 377 (CA5 1998), amended, 165 F. 3d 311, 312 (CA5 1999). While extensive violations might require a remedy along the lines asked for by respondents, no such evidence has been presented here. To the contrary, the presence of so few examples over a period of at least 4 years (15 years ago) tends to show not that the "no-diversion" rules have failed, but that they have worked. Accordingly, I see no reason to affirm the judgment below and thereby declare a properly functioning aid program unconstitutional.

Respondents' next evidentiary argument concerns an admitted violation of Chapter 2's secular content restriction. Over three years, Jefferson Parish religious schools ordered approximately 191 religious library books through Chapter 2. App. 129a–133a. Dan Lewis, the director of Louisiana's Chapter 2 program, testified that he discovered some of the religious books while performing a random check during a state monitoring visit to a Jefferson Parish religious school. *Id.,* at 99a–100a. The discovery prompted the State to notify the JPPSS, which then reexamined book requests dating back to 1982, discovered the 191 books in question, and recalled them. *Id.,* at 130a–133a. This series of events demonstrates not that the Chapter 2 safeguards are inadequate, but rather that the program's monitoring system succeeded. Even if I were instead willing to find this incident to be evidence of a likelihood of future violations, the evidence is insignificant. The 191 books constituted less than one percent of the total allocation of Chapter 2 aid in Jefferson Parish during the relevant years. *Id.,* at 132a. JUSTICE SOUTER understandably concedes that the book incident constitutes "only limited evidence." *Post,* at 909. I agree with the plurality that, like the above evidence of actual diversion, the borrowing of the religious library books constitutes only *de minimis* evidence. See *ante,* at 835.

Respondents' last evidentiary challenge concerns the effectiveness of Chapter 2's supplantation restriction in Jefferson Parish. Although JUSTICE SOUTER does not rest his decision on this point, he does "not[e] the likelihood that unconstitutional supplantation occurred as well." *Post*, at 910, n. 28. I disagree. The evidence cited by respondents and JUSTICE SOUTER is too ambiguous to rest any sound conclusions on and, at best, shows some scattered violations of the statutory supplantation restriction that are too insignificant in aggregate to affect the constitutional inquiry. Indeed, even JUSTICE SOUTER concedes in this respect that "[t]he record is sparse." *Post*, at 911, n. 28.

\* \* \*

Given the important similarities between the Chapter 2 program here and the Title I program at issue in *Agostini*, respondents' Establishment Clause challenge must fail. As in *Agostini*, the Chapter 2 aid is allocated on the basis of neutral, secular criteria; the aid must be supplementary and cannot supplant non-Federal funds; no Chapter 2 funds ever reach the coffers of religious schools; the aid must be secular; any evidence of actual diversion is *de minimis*; and the program includes adequate safeguards. Regardless of whether these factors are constitutional requirements, they are surely sufficient to find that the program at issue here does not have the impermissible effect of advancing religion. For the same reasons, "this carefully constrained program also cannot reasonably be viewed as an endorsement of religion." *Agostini*, 521 U. S., at 235. Accordingly, I concur in the judgment.

JUSTICE SOUTER, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, dissenting.

The First Amendment's Establishment Clause prohibits Congress (and, by incorporation, the States) from making any law respecting an establishment of religion. It has been

held to prohibit not only the institution of an official church, but any government act favoring religion, a particular religion, or for that matter irreligion. Thus, it bars the use of public funds for religious aid.

The establishment prohibition of government religious funding serves more than one end. It is meant to guarantee the right of individual conscience against compulsion, to protect the integrity of religion against the corrosion of secular support, and to preserve the unity of political society against the implied exclusion of the less favored and the antagonism of controversy over public support for religious causes.

These objectives are always in some jeopardy since the substantive principle of no aid to religion is not the only limitation on government action toward religion. Because the First Amendment also bars any prohibition of individual free exercise of religion, and because religious organizations cannot be isolated from the basic government functions that create the civil environment, it is as much necessary as it is difficult to draw lines between forbidden aid and lawful benefit. For more than 50 years, this Court has been attempting to draw these lines. Owing to the variety of factual circumstances in which the lines must be drawn, not all of the points creating the boundary have enjoyed self-evidence.

So far as the line drawn has addressed government aid to education, a few fundamental generalizations are nonetheless possible. There may be no aid supporting a sectarian school's religious exercise or the discharge of its religious mission, while aid of a secular character with no discernible benefit to such a sectarian objective is allowable. Because the religious and secular spheres largely overlap in the life of many such schools, the Court has tried to identify some facts likely to reveal the relative religious or secular intent or effect of the government benefits in particular circumstances. We have asked whether the government is acting neutrally in distributing its money, and about the form of the aid itself, its path from government to religious institution,

its divertibility to religious nurture, its potential for reducing traditional expenditures of religious institutions, and its relative importance to the recipient, among other things.

In all the years of its effort, the Court has isolated no single test of constitutional sufficiency, and the question in every case addresses the substantive principle of no aid: what reasons are there to characterize this benefit as aid to the sectarian school in discharging its religious mission? Particular factual circumstances control, and the answer is a matter of judgment.

In what follows I will flesh out this summary, for this case comes at a time when our judgment requires perspective on how the Establishment Clause has come to be understood and applied. It is not just that a majority today mistakes the significance of facts that have led to conclusions of unconstitutionality in earlier cases, though I believe the Court commits error in failing to recognize the divertibility of funds to the service of religious objectives. What is more important is the view revealed in the plurality opinion, which espouses a new conception of neutrality as a practically sufficient test of constitutionality that would, if adopted by the Court, eliminate enquiry into a law's effects. The plurality position breaks fundamentally with Establishment Clause principle, and with the methodology painstakingly worked out in support of it. I mean to revisit that principle and describe the methodology at some length, lest there be any question about the rupture that the plurality view would cause. From that new view of the law, and from a majority's mistaken application of the old, I respectfully dissent.

I

The prohibition that "Congress shall make no law respecting an establishment of religion," U. S. Const., Amdt. 1, eludes elegant conceptualization simply because the prohibition applies to such distinct phenomena as state churches and aid to religious schools, and as applied to school aid has

prompted challenges to programs ranging from construction subsidies to hearing aids to textbook loans. Any criteria, moreover, must not only define the margins of the establishment prohibition, but must respect the succeeding Clause of the First Amendment guaranteeing religion's free exercise. *Ibid.* It is no wonder that the complementary constitutional provisions and the inexhaustably various circumstances of their applicability have defied any simple test and have instead produced a combination of general rules often in tension at their edges. If coherence is to be had, the Court has to keep in mind the principal objectives served by the Establishment Clause, and its application to school aid, and their recollection may help to explain the misunderstandings that underlie the majority's result in this case.

## A

At least three concerns have been expressed since the founding and run throughout our First Amendment jurisprudence. First, compelling an individual to support religion violates the fundamental principle of freedom of conscience. Madison's and Jefferson's now familiar words establish clearly that liberty of personal conviction requires freedom from coercion to support religion,[1] and this means that the government can compel no aid to fund it. Madison put it simply: "[T]he same authority which can force a citizen to

---

[1] Jefferson's Virginia Bill for Establishing Religious Freedom provided "[t]hat no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever . . . ." Jefferson, A Bill for Establishing Religious Freedom, in 5 The Founder's Constitution 84 (P. Kurland & R. Lerner eds. 1987); see also *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 870–872 (1995) (SOUTER, J., dissenting). We have "previously recognized that the provisions of the First Amendment, in the drafting and adoption of which Madison and Jefferson played such leading roles, had the same objective and were intended to provide the same protection against governmental intrusion on religious liberty as the Virginia statute." *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 13 (1947).

contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment." Memorial and Remonstrance ¶ 3, reprinted in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 64, 65–66 (1947). Any tax to establish religion is antithetical to the command "that the minds of men always be wholly free." *Id.*, at 12 (discussing Madison's Memorial and Remonstrance); *id.*, at 13 (noting Jefferson's belief that "compel[ling] a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical; . . . even the forcing him to support this or that teacher of his own religious persuasion, is depriving him of the comfortable liberty of giving his contributions to the particular pastor, whose morals he would make his pattern" (internal quotation marks omitted)); see also *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 868–874 (1995) (SOUTER, J., dissenting).

Second, government aid corrupts religion. See *Engel* v. *Vitale*, 370 U. S. 421, 431 (1962) ("[The Establishment Clause's] first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion"); *Everson, supra,* at 53 (Rutledge, J., dissenting). Madison argued that establishment of religion weakened the beliefs of adherents so favored, strengthened their opponents, and generated "pride and indolence in the Clergy; ignorance and servility in the laity; [and] in both, superstition, bigotry and persecution." Memorial and Remonstrance ¶ 7, quoted in *Everson,* 330 U. S., at 67. "[E]xperience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation." *Ibid.* In a variant of Madison's concern, we have repeatedly noted that a government's favor to a particular religion or sect threatens to taint it with "corrosive secularism." *Lee* v. *Weisman*, 505 U. S. 577, 608 (1992) (internal quotation marks and citations omitted); see also *Illinois ex rel. McCollum* v. *Board*

*of Ed. of School Dist. No. 71, Champaign Cty.,* 333 U. S. 203, 228 (1948).

> "[G]overnment and religion have discrete interests which are mutually best served when each avoids too close a proximity to the other. It is not only the nonbeliever who fears the injection of sectarian doctrines and controversies into the civil polity, but in as high degree it is the devout believer who fears the secularization of a creed which becomes too deeply involved with and dependent upon the government." *School Dist. of Abington Township* v. *Schempp,* 374 U. S. 203, 259 (1963) (Brennan, J., concurring).

See also *Rosenberger, supra,* at 890–891 (SOUTER, J., dissenting).

Third, government establishment of religion is inextricably linked with conflict. *Everson, supra,* at 8–11 (relating colonists' understanding of recent history of religious persecution in countries with established religion); *Engel, supra,* at 429 (discussing struggle among religions for government approval); *Lemon* v. *Kurtzman,* 403 U. S. 602, 623 (1971). In our own history, the turmoil thus produced has led to a rejection of the idea that government should subsidize religious education, *id.,* at 645–649 (opinion of Brennan, J.) (discussing history of rejection of support for religious schools); *McCollum, supra,* at 214–217 (opinion of Frankfurter, J.), a position that illustrates the Court's understanding that any implicit endorsement of religion is unconstitutional, see *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U. S. 573, 592–594 (1989).[2]

---

[2] The plurality mistakes my recognition of this fundamental concern. *Ante,* at 825–826. The Court may well have moved away from considering the political divisiveness threatened by particular instances of aid as a practical criterion for applying the Establishment Clause case by case, but we have never questioned its importance as a motivating concern behind the Establishment Clause, nor could we change history to find that sectarian conflict did not influence the Framers who wrote it.

B

These concerns are reflected in the Court's classic summation delivered in *Everson* v. *Board of Education, supra,* its first opinion directly addressing standards governing aid to religious schools:[3]

> "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.'" 330 U. S., at 15–16 (quoting *Reynolds* v. *United States,* 98 U. S. 145, 164 (1879)).

The most directly pertinent doctrinal statements here are these: no government "can pass laws which aid one religion

---

[3] The Court upheld payments by Indian tribes to apparently Roman Catholic schools in *Quick Bear* v. *Leupp,* 210 U. S. 50 (1908), suggesting in dicta that there was no Establishment Clause problem, but it did not squarely face the question. Nor did the Court address a First Amendment challenge to a state program providing textbooks to children in *Cochran* v. *Louisiana Bd. of Ed.,* 281 U. S. 370 (1930); it simply concluded that the program had an adequate public purpose. The Court first squarely faced the issue in *Everson.*

[or] all religions . . . . No tax in any amount . . . can be levied to support any religious activities or institutions . . . whatever form they may adopt to teach . . . religion." 330 U. S., at 16. Thus, the principle of "no aid," with which no one in *Everson* disagreed.[4]

Immediately, however, there was the difficulty over what might amount to "aid" or "support." The problem for the *Everson* Court was not merely the imprecision of the words, but the "other language of the [First Amendment that] commands that [government] cannot hamper its citizens in the free exercise of their own religion," *ibid.*, with the consequence that government must "be a neutral in its relations with groups of religious believers and non-believers," *id.*, at 18. Since withholding some public benefits from religious groups could be said to "hamper" religious exercise indirectly, and extending other benefits said to aid it, an argument-proof formulation of the no-aid principle was impossible, and the Court wisely chose not to attempt any such thing. Instead it gave definitive examples of public benefits provided pervasively throughout society that would be of some value to organized religion but not in a way or to a degree that could sensibly be described as giving it aid or violating the neutrality requirement: there was no Establishment Clause concern with "such general government services as ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks." *Id.*, at 17–18. These "benefits of public welfare legislation," *id.*, at 16, extended in modern times to virtually every member of the population and valuable to every person and association, were the paradigms of advantages that religious organiza-

---

[4] While *Everson*'s dissenters parted company with the majority over the specific question of school buses, the Court stood as one behind the principle of no aid for religious teaching. 330 U. S., at 15–16; *id.*, at 25–26 (Jackson, J., dissenting); *id.*, at 28–29, 31–32 (Rutledge, J., dissenting).

tions could enjoy consistently with the prohibition against aid, and that governments could extend without deserting their required position of neutrality.

But paradigms are not perfect fits very often, and government spending resists easy classification as between universal general service or subsidy of favoritism. The 5-to-4 division of the *Everson* Court turned on the inevitable question whether reimbursing all parents for the cost of transporting their children to school was close enough to police protection to tolerate its indirect benefit in some degree to religious schools, with the majority in *Everson* thinking the reimbursement statute fell on the lawful side of the line. Although the state scheme reimbursed parents for transporting children to sectarian schools, among others, it gave "no money to the schools. It [did] not support them. Its legislation [did] no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools." *Id.*, at 18. The dissenters countered with factual analyses showing the limitation of the law's benefits in fact to private school pupils who were Roman Catholics, *id.*, at 20 (Jackson, J., dissenting), and indicating the inseparability of transporting pupils to school from support for the religious instruction that was the school's *raison d'être, id.*, at 45–46 (Rutledge, J., dissenting).

*Everson* is usefully understood in the light of a successor case two decades later, *Board of Ed. of Central School Dist. No. 1* v. *Allen,* 392 U. S. 236 (1968), in which the challenged government practice was lending textbooks to pupils of schools both public and private, including religious ones (as to which there was no evidence that they had previously supplied books to their classes and some evidence that they had not, *id.*, at 244, n. 6). By the time of *Allen,* the problem of classifying the state benefit, as between aid to religion and general public service consistent with government neutral-

ity, had led to the formulation of a "test" that required secular, primary intent and effect as necessary conditions of any permissible scheme. *Id.*, at 243. Again the Court split, upholding the state law in issue, but with *Everson's* majority author, Justice Black, now in dissent. What is remarkable about *Allen* today, however, is not so much its division as its methodology, for the consistency in the way the Justices went about deciding the case transcended their different conclusions. Neither side rested on any facile application of the "test" or any simplistic reliance on the generality or even-handedness of the state law. Disagreement concentrated on the true intent inferrable behind the law, the feasibility of distinguishing in fact between religious and secular teaching in church schools, and the reality or sham of lending books to pupils instead of supplying books to schools. The majority, to be sure, cited the provision for books to all school-children, regardless of religion, 392 U. S., at 243, just as the *Everson* majority had spoken of the transportation reimbursement as going to all, 330 U. S., at 16, in each case for the sake of analogy to the provision of police and fire services.[5] But the stress was on the practical significance of the actual benefits received by the schools. As *Everson* had rested on the understanding that no money and no support went to the school, *id.*, at 18, *Allen* emphasized that the savings to parents were devoid of any measurable effect in teaching religion, 392 U. S., at 243–244. Justice Harlan, concurring, summed up the approach with his observations that the required government "[n]eutrality is . . . a coat of many colors," and quoted Justice Goldberg's conclusion, that there was "'no simple and clear measure' . . . by which this or any [religious school aid] case may readily be decided," *id.*, at 249 (quoting *Schempp*, 374 U. S., at 306).

---

[5] Indeed, two of the dissenters in *Allen* agreed with the majority on this method of analysis, asking whether the books at issue were similar enough to fire and police protection. See 392 U. S., at 252 (Black, J., dissenting); *id.*, at 272 (Fortas, J., dissenting).

After *Everson* and *Allen*, the state of the law applying the Establishment Clause to public expenditures producing some benefit to religious schools was this:

1. Government aid to religion is forbidden, and tax revenue may not be used to support a religious school or religious teaching.

2. Government provision of such paradigms of universally general welfare benefits as police and fire protection does not count as aid to religion.

3. Whether a law's benefit is sufficiently close to universally general welfare paradigms to be classified with them, as distinct from religious aid, is a function of the purpose and effect of the challenged law in all its particularity. The judgment is not reducible to the application of any formula. Evenhandedness of distribution as between religious and secular beneficiaries is a relevant factor, but not a sufficiency test of constitutionality. There is no rule of religious equal protection to the effect that any expenditure for the benefit of religious school students is necessarily constitutional so long as public school pupils are favored on ostensibly identical terms.

4. Government must maintain neutrality as to religion, "neutrality" being a conclusory label for the required position of government as neither aiding religion nor impeding religious exercise by believers. "Neutrality" was not the name of any test to identify permissible action, and in particular, was not synonymous with evenhandedness in conferring benefit on the secular as well as the religious.

Today, the substantive principle of no aid to religious mission remains the governing understanding of the Establishment Clause as applied to public benefits inuring to religious schools. The governing opinions on the subject in the 35 years since *Allen* have never challenged this principle. The

cases have, however, recognized that in actual Establishment Clause litigation over school aid legislation, there is no pure aid to religion and no purely secular welfare benefit; the effects of the laws fall somewhere in between, with the judicial task being to make a realistic allocation between the two possibilities. The Court's decisions demonstrate its repeated attempts to isolate considerations relevant in classifying particular benefits as between those that do not discernibly support or threaten support of a school's religious mission, and those that cross or threaten to cross the line into support for religion.

## II

### A

The most deceptively familiar of those considerations is "neutrality," the presence or absence of which, in some sense, we have addressed from the moment of *Everson* itself. I say "some sense," for we have used the term in at least three ways in our cases, and an understanding of the term's evolution will help to explain the concept as it is understood today, as well as the limits of its significance in Establishment Clause analysis. "Neutrality" has been employed as a term to describe the requisite state of government equipoise between the forbidden encouragement and discouragement of religion; to characterize a benefit or aid as secular; and to indicate evenhandedness in distributing it.

As already mentioned, the Court first referred to neutrality in *Everson,* simply stating that government is required "to be a neutral" among religions and between religion and nonreligion. 330 U. S., at 18. Although "neutral" may have carried a hint of inaction when we indicated that the First Amendment "does not require the state to be [the] adversary" of religious believers, *ibid.,* or to cut off general government services from religious organizations, *Everson* provided no explicit definition of the term or further indication of what the government was required to do or not do to be

"neutral" toward religion. In practical terms, "neutral" in *Everson* was simply a term for government in its required median position between aiding and handicapping religion. The second major case on aid to religious schools, *Allen,* used "neutrality" to describe an adequate state of balance between government as ally and as adversary to religion, see 392 U. S., at 242 (discussing line between "state neutrality to religion and state support of religion"). The term was not further defined, and a few subsequent school cases used "neutrality" simply to designate the required relationship to religion, without explaining how to attain it. See, *e. g., Tilton* v. *Richardson,* 403 U. S. 672, 677 (1971) (describing cases that "see[k] to define the boundaries of the neutral area between [the Religion Clauses] within which the legislature may legitimately act"); *Roemer* v. *Board of Public Works of Md.,* 426 U. S. 736, 747 (1976) (plurality opinion of Blackmun, J.) ("Neutrality is what is required. The State must confine itself to secular objectives, and neither advance nor impede religious activity. Of course, that principle is more easily stated than applied"); see also *Committee for Public Ed. & Religious Liberty* v. *Nyquist,* 413 U. S. 756, 782 (1973) (describing "neutral posture" toward religion); *Roemer, supra,* at 745–746 (opinion of Blackmun, J.) ("The Court has enforced a scrupulous neutrality by the State, as among religions, and also as between religious and other activities"); cf. *Wolman* v. *Walter,* 433 U. S. 229, 254 (1977) (quoting *Lemon* and noting difficulty of religious teachers' remaining " 'religiously neutral' ").

The Court began to employ "neutrality" in a sense different from equipoise, however, as it explicated the distinction between "religious" and "secular" benefits to religious schools, the latter being in some circumstances permissible. See *infra,* at 884–899 (discussing considerations). Even though both *Everson* and *Allen* had anticipated some such distinction, neither case had used the term "neutral" in this way. In *Everson,* Justice Black indicated that providing

police, fire, and similar government services to religious institutions was permissible, in part because they were "so separate and so indisputably marked off from the religious function." 330 U. S., at 18. *Allen* similarly focused on the fact that the textbooks lent out were "secular" and approved by secular authorities, 392 U. S., at 245, and assumed that the secular textbooks and the secular elements of education they supported were not so intertwined with religious instruction as "in fact [to be] instrumental in the teaching of religion," *id.,* at 248. Such was the Court's premise in *Lemon* for shifting the use of the word "neutral" from labeling the required position of the government to describing a benefit that was nonreligious. We spoke of "[o]ur decisions from *Everson* to *Allen* [as] permitt[ing] the States to provide church-related schools with secular, neutral, or nonideological services, facilities, or materials," 403 U. S., at 616, and thereafter, we regularly used "neutral" in this second sense of "secular" or "nonreligious." See, *e. g., Tilton, supra,* at 687–688 (characterizing subsidized teachers in *Lemon* as "not necessarily religiously neutral," but buildings as "religiously neutral"); *Meek* v. *Pittenger,* 421 U. S. 349, 365–366 (1975) (describing instructional materials as " 'secular, nonideological and neutral' " and "wholly neutral"); *id.,* at 372 (describing auxiliary services as "religiously neutral"); *Roemer, supra,* at 751 (opinion of Blackmun, J.) (describing *Tilton*'s approved buildings as "neutral or nonideological in nature"); 426 U. S., at 754 (describing *Meek*'s speech and hearing services as "neutral and nonideological"); *Zobrest* v. *Catalina Foothills School Dist.,* 509 U. S. 1, 10 (1993) (discussing translator as "neutral service"); *Agostini* v. *Felton,* 521 U. S. 203, 232 (1997) (discussing need to assess whether nature of aid was "neutral and nonideological"); cf. *Levitt* v. *Committee for Public Ed. & Religious Liberty,* 413 U. S. 472, 478 (1973) (noting that District Court approved testing cost reimbursement as payment for services that were " 'secular, neutral, or nonideological' " in character, citing *Lemon,* 403 U. S., at

616); *Wolman, supra*, at 242 (quoting *Lemon, supra*, at 616 (describing permitted services aid as "secular, neutral, or nonideological")).

The shift from equipoise to secular was not, however, our last redefinition, for the Court again transformed the sense of "neutrality" in the 1980's. Reexamining and reinterpreting *Everson* and *Allen*, we began to use the word "neutral" to mean "evenhanded," in the sense of allocating aid on some common basis to religious and secular recipients. Again, neither *Everson* nor *Allen* explicitly used "neutral" in this manner, but just as the label for equipoise had lent itself to referring to the secular characteristic of what a government might provide, it was readily adaptable to referring to the generality of government services, as in *Everson*'s paradigms, to which permissible benefits were compared.

The increased attention to a notion of evenhanded distribution was evident in *Nyquist*, where the Court distinguished the program under consideration from the government services approved in *Allen* and *Everson*, in part because "the class of beneficiaries [in *Everson* and *Allen*] included *all* schoolchildren, those in public as well as those in private schools." 413 U. S., at 782, n. 38. *Nyquist* then reserved the question whether "some form of public assistance . . . made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefitted" would be permissible. *Id.*, at 783, n. 38 (citations omitted). Subsequent cases continued the focus on the "generality" of the approved government services as an important characteristic. *Meek*, for example, characterized *Everson* and *Allen* as approving "a general program" to pay bus fares and to lend school books, respectively, 421 U. S., at 360; *id.*, at 360, n. 8 (approving two similar "general program[s]" in New York and Pennsylvania), and *Wolman* upheld diagnostic services described as "'general welfare services for children,'" 433 U. S., at 243 (quoting *Meek, supra*, at 371, n. 21).

Justice Blackmun, writing in *Roemer*, first called such a "general" or evenhanded program "neutral," in speaking of "facial neutrality" as a relevant consideration in determining whether there was an Establishment Clause violation. "[R]eligious institutions need not be quarantined from public benefits that are neutrally available to all." 426 U. S., at 746–747; see also *id.*, at 746 (discussing buses in *Everson* and school books in *Allen* as examples of "neutrally available" aid). In *Mueller* v. *Allen*, 463 U. S. 388 (1983), the Court adopted the redefinition of neutrality as evenhandedness, citing *Nyquist*, 413 U. S., at 782, n. 38, and alluding to our discussion of equal access in *Widmar* v. *Vincent*, 454 U. S. 263 (1981). The Court upheld a system of tax deductions for sectarian educational expenses, in part because such a "facially neutral law," 463 U. S., at 401, made the deduction available for "*all* parents, including those whose children attend public schools and those whose children attend nonsectarian private schools or sectarian private schools," *id.*, at 397. Subsequent cases carried the point forward. See, *e. g., Witters* v. *Washington Dept. of Servs. for Blind*, 474 U. S. 481, 487 (1986) (quoting *Nyquist* and characterizing program as making aid "available generally"); *Zobrest, supra*, at 8–9 (discussing "government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion" and citing *Mueller* and *Witters*); *Agostini, supra*, at 231 (discussing aid allocated on the basis of "neutral, secular criteria that neither favor nor disfavor religion, . . . made available to both religious and secular beneficiaries on a nondiscriminatory basis"); see also *Rosenberger*, 515 U. S., at 839 ("[T]he guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse").

In sum, "neutrality" originally entered this field of jurisprudence as a conclusory term, a label for the required rela-

tionship between the government and religion as a state of equipoise between government as ally and government as adversary. Reexamining *Everson*'s paradigm cases to derive a prescriptive guideline, we first determined that "neutral" aid was secular, nonideological, or unrelated to religious education. Our subsequent reexamination of *Everson* and *Allen*, beginning in *Nyquist* and culminating in *Mueller* and most recently in *Agostini*, recast neutrality as a concept of "evenhandedness."

There is, of course, good reason for considering the generality of aid and the evenhandedness of its distribution in making close calls between benefits that in purpose or effect support a school's religious mission and those that do not. This is just what *Everson* did. Even when the disputed practice falls short of *Everson*'s paradigms, the breadth of evenhanded distribution is one pointer toward the law's purpose, since on the face of it aid distributed generally and without a religious criterion is less likely to be meant to aid religion than a benefit going only to religious institutions or people. And, depending on the breadth of distribution, looking to evenhandedness is a way of asking whether a benefit can reasonably be seen to aid religion in fact; we do not regard the postal system as aiding religion, even though parochial schools get mail. Given the legitimacy of considering evenhandedness, then, there is no reason to avoid the term "neutrality" to refer to it. But one crucial point must be borne in mind.

In the days when "neutral" was used in *Everson*'s sense of equipoise, neutrality was tantamount to constitutionality; the term was conclusory, but when it applied it meant that the government's position was constitutional under the Establishment Clause. This is not so at all, however, under the most recent use of "neutrality" to refer to generality or evenhandedness of distribution. This kind of neutrality is relevant in judging whether a benefit scheme so characterized should be seen as aiding a sectarian school's religious

mission, but this neutrality is not alone sufficient to qualify the aid as constitutional. It is to be considered only along with other characteristics of aid, its administration, its recipients, or its potential that have been emphasized over the years as indicators of just how religious the intent and effect of a given aid scheme really is. See, *e. g., Tilton,* 403 U. S., at 677–678 (opinion of Burger, C. J.) (acknowledging "no single constitutional caliper"); *Meek,* 421 U. S., at 358–359 (noting considerations as guidelines only and discussing them as a matter of degree); *School Dist. of Grand Rapids* v. *Ball,* 473 U. S. 373, 383 (1985) (quoting *Meek*), overruled in part by *Agostini,* 521 U. S., at 203; *Board of Ed. of Kiryas Joel Village School Dist.* v. *Grumet,* 512 U. S. 687, 720 (1994) (opinion of O'CONNOR, J.) ("Experience proves that the Establishment Clause, like the Free Speech Clause, cannot easily be reduced to a single test"); *Rosenberger,* 515 U. S., at 847–849 (O'CONNOR, J., concurring) (discussing need for line-drawing); *id.,* at 852 (noting lack of a single "Grand Unified Theory" for Establishment Clause and citing *Kiryas Joel*); cf. *Agostini, supra,* at 232–233 (examining a variety of factors). Thus, the basic principle of establishment scrutiny of aid remains the principle as stated in *Everson,* that there may be no public aid to religion or support for the religious mission of any institution.

B

The insufficiency of evenhandedness neutrality as a stand-alone criterion of constitutional intent or effect has been clear from the beginning of our interpretative efforts, for an obvious reason. Evenhandedness in distributing a benefit approaches the equivalence of constitutionality in this area only when the term refers to such universality of distribution that it makes no sense to think of the benefit as going to any discrete group. Conversely, when evenhandedness refers to distribution to limited groups within society, like groups of schools or schoolchildren, it does make sense to regard the benefit as aid to the recipients. See, *e. g., Everson,* 330 U. S.,

at 16 (discussing aid that approaches the "verge" of forbidden territory); *Lemon,* 403 U. S., at 612 ("[W]e can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law"); *Nyquist,* 413 U. S., at 760–761 (noting the "most perplexing questions" presented in this area and acknowledging "'entangl[ing] precedents'"); *Mueller,* 463 U. S., at 393 (quoting *Lemon*); *Witters,* 474 U. S., at 485 (quoting *Lemon*).

Hence, if we looked no further than evenhandedness, and failed to ask what activities the aid might support, or in fact did support, religious schools could be blessed with government funding as massive as expenditures made for the benefit of their public school counterparts, and religious missions would thrive on public money. This is why the consideration of less than universal neutrality has never been recognized as dispositive and has always been teamed with attention to other facts bearing on the substantive prohibition of support for a school's religious objective.

At least three main lines of enquiry addressed particularly to school aid have emerged to complement evenhandedness neutrality. First, we have noted that two types of aid recipients heighten Establishment Clause concern: pervasively religious schools and primary and secondary religious schools. Second, we have identified two important characteristics of the method of distributing aid: directness or indirectness of distribution and distribution by genuinely independent choice. Third, we have found relevance in at least five characteristics of the aid itself: its religious content; its cash form; its divertibility or actually diversion to religious support; its supplantation of traditional items of religious school expense; and its substantiality.

1

Two types of school aid recipients have raised special concern. First, we have recognized the fact that the overriding religious mission of certain schools, those sometimes called

"pervasively sectarian," is not confined to a discrete element of the curriculum, *Everson*, 330 U. S., at 22–24 (Jackson, J., dissenting); *id.*, at 45–47 (Rutledge, J., dissenting), but permeates their teaching.[6] *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 671 (1970); *Lemon*, *supra*, at 636–637 ("A school which operates to commingle religion with other instruction plainly cannot completely secularize its instruction. Parochial schools, in large measure, do not accept the assumption that secular subjects should be unrelated to religious teaching"); see also *Bowen* v. *Kendrick*, 487 U. S. 589, 621–622 (1988) (discussing pervasively sectarian private schools). Based on record evidence and long experience, we have concluded that religious teaching in such schools is at the core of the instructors' individual and personal obligations, cf. Canon 803, § 2, Text & Commentary 568 ("It is necessary that the formation and education given in a Catholic school be based upon the principles of Catholic doctrine; teachers are to be outstanding for their correct doctrine and integrity of life"), and that individual religious teachers will teach religiously.[7] *Lemon*, 403 U. S., at 615–620; *id.*, at 635–

---

[6] In fact, religious education in Roman Catholic schools is defined as part of required religious practice; aiding it is thus akin to aiding a church service. See 1983 Code of Canon Law, Canon 798, reprinted in The Code of Canon Law: A Text and Commentary 566 (1985) (hereinafter Text & Commentary) (directing parents to entrust children to Roman Catholic schools or otherwise provide for Roman Catholic education); Canon 800, § 2, Text & Commentary 567 (requiring the faithful to support establishment and maintenance of Roman Catholic schools); Canons 802, 804, Text & Commentary 567, 568 (requiring diocesan bishop to establish and regulate schools "imparting an education imbued with the Christian spirit").

[7] Although the Court no longer assumes that public school teachers assigned to religious schools for limited purposes will teach religiously, see *Agostini* v. *Felton*, 521 U. S. 203, 223–228 (1997), we have never abandoned the presumption that religious teachers will teach just that way. *Lemon* v. *Kurtzman*, 403 U. S. 602, 615–620 (1971); *id.*, at 635–641 (Douglas, J., concurring); *Levitt* v. *Committee for Public Ed. & Religious Liberty*, 413 U. S. 472, 480 (1973); *Meek* v. *Pittenger*, 421 U. S. 349, 369–371 (1975); *Wol-*

641 (Douglas, J., concurring); *Levitt,* 413 U. S., at 480; *Meek,* 421 U. S., at 369–371; *Wolman,* 433 U. S., at 249–250 (discussing nonseverability of religious and secular education); *Ball,* 473 U. S., at 399–400 (O'CONNOR, J., concurring in judgment in part and dissenting in part), overruled in part by *Agostini,* 521 U. S., at 236. As religious teaching cannot be separated from secular education in such schools or by such teachers, we have concluded that direct government subsidies to such schools are prohibited because they will inevitably and impermissibly support religious indoctrination. *Zobrest,* 509 U. S., at 12 (discussing *Meek* and *Ball*).

Second, we have expressed special concern about aid to primary and secondary religious schools. *Tilton,* 403 U. S., at 685–686. On the one hand, we have understood how the youth of the students in such schools makes them highly susceptible to religious indoctrination. *Lemon, supra,* at 616 ("This process of inculcating religious doctrine is, of course, enhanced by the impressionable age of the pupils, in primary schools particularly"). On the other, we have recognized that the religious element in the education offered in most sectarian primary and secondary schools is far more intertwined with the secular than in university teaching, where the natural and academic skepticism of most older students may separate the two, see *Tilton, supra,* at 686–689; *Roemer,* 426 U. S., at 750. Thus, government benefits accruing to these pervasively religious primary and secondary schools raise special dangers of diversion into support for the religious indoctrination of children and the involvement of government in religious training and practice.

―――――――――

*man* v. *Walter,* 433 U. S. 229, 249–250 (1977); *School Dist. of Grand Rapids* v. *Ball,* 473 U. S. 373, 399–400 (1985) (O'CONNOR, J., concurring in judgment in part and dissenting in part), overruled in part by *Agostini, supra,* at 236. Cf. *NLRB* v. *Catholic Bishop of Chicago,* 440 U. S. 490, 504 (1979) ("The church-teacher relationship in a church-operated school differs from the employment relationship in a public or other nonreligious school").

## 2

We have also evaluated the portent of support to an organization's religious mission that may be inherent in the method by which aid is granted, finding pertinence in at least two characteristics of distribution. First, we have asked whether aid is direct or indirect, observing distinctions between government schemes with individual beneficiaries and those whose beneficiaries in the first instance might be religious schools. *Everson, supra,* at 18 (bus fare supports parents and not schools); *Allen,* 392 U. S., 243–244, and n. 6 (textbooks go to benefit children and parents, not schools); *Lemon, supra,* at 621 (invalidating direct aid to schools); *Levitt, supra,* at 480, 482 (invalidating direct testing aid to schools); *Witters,* 474 U. S., at 487–488 (evaluating whether aid was a direct subsidy to schools). Direct aid obviously raises greater risks, although recent cases have discounted this risk factor, looking to other features of the distribution mechanism. *Agostini, supra,* at 225–226.[8]

---

[8] In *Agostini,* the Court indicated that "we have departed from the rule relied on in *Ball* that all government aid that directly assists the educational function of religious schools is invalid," 521 U. S., at 225, and cited *Witters* v. *Washington Dept. of Servs. for Blind,* 474 U. S. 481 (1986), and *Zobrest* v. *Catalina Foothills School Dist.,* 509 U. S. 1 (1993). However, *Agostini* did not rely on this dictum, instead clearly stating that "[w]hile it is true that individual students may not directly apply for Title I services, it does not follow from this premise that those services are distributed 'directly to the religious schools.' In fact, they are not. No Title I funds ever reach the coffers of religious schools, and Title I services may not be provided to religious schools on a schoolwide basis." 521 U. S., at 228–229 (citations omitted). Until today, this Court has never permitted aid to go directly to schools on a schoolwide basis.

The plurality misreads our precedent in suggesting that we have abandoned directness of distribution as a relevant consideration. See *ante,* at 815–818. In *Wolman,* we stated that nominally describing aid as to students would not bar a court from finding that it actually provided a subsidy to a school, 433 U. S., at 250, but we did not establish that a program giving "direct" aid to schools was therefore permissible. In *Witters,* we made the focus of *Wolman* clear, continuing to examine aid to determine

Second, we have distinguished between indirect aid that reaches religious schools only incidentally as a result of numerous individual choices and aid that is in reality directed to religious schools by the government or in practical terms selected by religious schools themselves. *Mueller,* 463 U. S., at 399; *Witters, supra,* at 488; *Zobrest, supra,* at 10. In these cases, we have declared the constitutionality of programs providing aid directly to parents or students as tax deductions or scholarship money, where such aid may pay for education at some sectarian institutions, *Mueller, supra,* at 399; *Witters,* 474 U. S., at 488, but only as the result of "genuinely independent and private choices of aid recipients," *id.,* at 487. We distinguished this path of aid from the route in *Ball* and *Wolman,* where the opinions indicated that "[w]here . . . no meaningful distinction can be made between aid to the student and aid to the school, the concept of a loan to individuals is a transparent fiction." 474 U. S., at 487, n. 4 (citations and internal quotation marks omitted).[9]

### 3

In addition to the character of the school to which the benefit accrues, and its path from government to school, a number of features of the aid itself have figured in the classifica-

if it was a "direct subsidy" to a school, 474 U. S., at 487, and distinguishing the aid at issue from impermissible aid in *Ball* and *Wolman* precisely because the designation of the student as recipient in those cases was only nominal. 474 U. S., at 487, n. 4. Our subsequent cases have continued to ask whether government aid programs constituted impermissible "direct subsidies" to religious schools even where they are directed by individual choice. *Zobrest, supra,* at 11–13; *Mueller* v. *Allen,* 463 U. S. 388, 399 (1983); *Agostini, supra,* at 226.

[9] We have also permitted the government to supply students with public-employee translators, *Zobrest, supra,* at 10, and public-employee special education teachers, *Agostini, supra,* at 226, 228, who directly provided them with government services in whatever schools those specific students attended, public or nonpublic. I have already noted *Agostini's* limitations. See n. 8, *supra.*

tions we have made. First, we have barred aid with actual religious content, which would obviously run afoul of the ban on the government's participation in religion, *Everson,* 330 U. S., at 16; *Walz,* 397 U. S., at 668; cf. *Lemon,* 403 U. S., at 617 (discussing variable ideological and religious character of religious teachers compared to fixed content of books). In cases where we have permitted aid, we have regularly characterized it as "neutral" in the sense (noted *supra,* at 879–881) of being without religious content. See, *e. g., Tilton,* 403 U. S., at 688 (characterizing buildings as "religiously neutral"); *Zobrest,* 509 U. S., at 10 (describing translator as "neutral service"); *Agostini,* 521 U. S., at 232 (discussing need to assess whether nature of aid was "neutral and nonideological"). See also *ante,* at 820 (plurality opinion) (barring aid with religious content).[10]

Second, we have long held government aid invalid when circumstances would allow its diversion to religious education. The risk of diversion is obviously high when aid in the form of government funds makes its way into the coffers of religious organizations, and so from the start we have understood the Constitution to bar outright money grants of aid to religion.[11] See *Everson,* 330 U. S., at 16 ("[The State]

---

[10] I agree with the plurality that the Establishment Clause absolutely prohibits the government from providing aid with clear religious content to religious, or for that matter nonreligious, schools. *Ante,* at 822–825. The plurality, however, misreads our precedent as focusing only on affirmatively religious content. At the very least, a building, for example, has no such content, but we have squarely required the government to ensure that no publicly financed building be diverted to religious use. *Tilton* v. *Richardson,* 403 U. S. 672, 681–684 (1971). See also *Bowen* v. *Kendrick,* 487 U. S. 589, 623 (1988) (O'CONNOR, J., concurring) ("*[A]ny* use of public funds to promote religious doctrines violates the Establishment Clause").

[11] We have similarly noted that paying salaries of parochial school teachers creates too much of a risk that such support will aid the teaching of religion, striking down such programs because of the need for pervasive monitoring that would be required. See *Lemon,* 403 U. S., at 619 ("We do not assume, however, that parochial school teachers will be unsuccessful

cannot consistently with the 'establishment of religion' clause of the First Amendment contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church"); *id.,* at 18 ("The State contributes no money to the schools. It does not support them"); *Allen,* 392 U. S., at 243–244 ("[N]o funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not schools"); *Walz, supra,* at 675 ("Obviously a direct money subsidy would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards"); *Lemon, supra,* at 612 (identifying "three main evils" against which Establishment Clause was to protect as "sponsorship, financial support, and active involvement of the sovereign in religious activity," citing *Walz*); 403 U. S., at 621 (distinguishing direct financial aid program from *Everson* and *Allen* and noting problems with required future surveillance); *Nyquist,* 413 U. S., at 762, 774 (striking down "direct money grants" for maintaining buildings because there was no attempt to restrict payments to those expenditures related exclusively to secular purposes); *Levitt,* 413 U. S., at 480, 482 (striking down "direct money grant" for testing expenses); [12] *Hunt* v.

---

in their attempts to segregate their religious beliefs from their secular educational responsibilities. But the potential for impermissible fostering of religion is present. The [state legislature] has not, and could not, provide state aid on the basis of a mere assumption that secular teachers under religious discipline can avoid conflicts. The State must be certain, given the Religion Clauses, that subsidized teachers do not inculcate religion .... A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected").

[12] It is true that we called the importance of the cash payment consideration into question in *Committee for Public Ed. and Religious Liberty* v. *Regan,* 444 U. S. 646, 657–659 (1980) (approving program providing religious school with "direct cash reimbursement" for expenses of standardized testing). In that case, we found the other safeguards against the diversion of such funds to religious uses sufficient to allow such aid: "A

*McNair,* 413 U. S. 734, 745, n. 7 (1973) (noting approved aid is "no expenditure of public funds, either by grant or loan"); *Wolman,* 433 U. S., at 239, and n. 7 (noting that "statute does not authorize any payment to nonpublic school personnel for the costs of administering the tests"); *Agostini,* 521 U. S., at 228–229 (emphasizing that approved services are not "distributed 'directly to the religious schools.' . . . No Title I funds ever reach the coffers of religious schools, and Title I services may not be provided to religious schools on a school-wide basis" (citations omitted)); *Bowen,* 487 U. S., at 614–615; *Rosenberger,* 515 U. S., at 842 (noting that "we have recognized special Establishment Clause dangers where the government makes direct money payments to sectarian institutions"); cf. *Lemon,* 403 U. S., at 619–620 (noting that safeguards and accounting inspections required to prevent government funds from supporting religious education will cause impermissible entanglement); *Roemer,* 426 U. S., at 753–757 (approving segregated funds after finding recipients not pervasively religious); *Ball,* 473 U. S., at 392–393 (noting that "[w]ith but one exception, our subsequent cases have struck down attempts by States to make payments out of

contrary view would insist on drawing a constitutional distinction between paying the nonpublic school to do the grading and paying state employees or some independent service to perform that task, even though the grading function is the same regardless of who performs it and would not have the primary effect of aiding religion whether or not performed by nonpublic school personnel." *Id.,* at 658. Aside from this isolated circumstance, where we found ironclad guarantees of nondiversion, we have never relaxed our prohibition on direct cash aid to pervasively religious schools, and have in fact continued to acknowledge the concern. See *Agostini,* 521 U. S., at 228–229; cf. *Rosenberger,* 515 U. S., at 842.

The plurality concedes this basic point. See *ante,* at 818–819. Given this, I find any suggestion that this prohibition has been undermined by *Mueller* or *Witters* without foundation. See *ante,* at 819–820, n. 8. Those cases involved entirely different types of aid, namely, tax deductions and individual scholarship aid for university education, see also n. 16, *infra,* and were followed by *Rosenberger* and *Agostini,* which continued to support this absolute restriction.

public tax dollars directly to primary or secondary religious educational institutions"), overruled in part by *Agostini, supra,* at 236; *Witters,* 474 U. S., at 487 ("It is equally well-settled . . . that the State may not grant aid to a religious school, whether cash or in kind, where the effect of the aid is that of a direct subsidy to the religious school" (internal quotation marks and citations omitted)); *Rosenberger, supra,* at 851–852 (O'CONNOR, J., concurring) (noting that student fee was not a tax).

Divertibility is not, of course, a characteristic of cash alone, and when examining provisions for ostensibly secular supplies we have considered their susceptibility to the service of religious ends.[13] In upholding a scheme to provide students with secular textbooks, we emphasized that "each book loaned must be approved by the public school authorities; only secular books may receive approval." *Allen,* 392 U. S., at 244–245; see also *Meek,* 421 U. S., at 361–362 (opinion of Stewart, J.); *Wolman, supra,* at 237–238. By the same token, we could not sustain provisions for instructional materials adaptable to teaching a variety of subjects.[14] *Meek, supra,* at 363; *Wolman, supra,* at 249–250. While the textbooks had a known and fixed secular content not readily di-

---

[13] I reject the plurality's argument that divertibility is a boundless principle. *Ante,* at 824–825. Our long experience of evaluating this consideration demonstrates its practical limits. See *infra* this page and 894–895. Moreover, the Establishment Clause charges us with making such enquiries, regardless of their difficulty. See *supra,* at 875–878, 884–885. Finally, the First Amendment's rule permitting only aid with fixed secular content seems no more difficult to apply than the plurality's rule prohibiting only aid with fixed religious content.

[14] Contrary to the plurality's apparent belief, *Lamb's Chapel* v. *Center Moriches Union Free School Dist.,* 508 U. S. 384 (1993), sheds no light on the question of divertibility and school aid. *Ante,* at 822, n. 9. The Court in that case clearly distinguished the question of afterschool access to public facilities from anything resembling the school aid cases: "The showing of this film series would not have been during school hours, would not have been sponsored by the school, and would have been open to the public, not just to church members." 508 U. S., at 395.

vertible to religious teaching purposes, the adaptable materials did not.[15]   So, too, we explained the permissibility of busing on public routes to schools but not busing for field trips designed by religious authorities specifically because the latter trips were components of teaching in a pervasively religious school.   Compare *Everson*, 330 U. S., at 17 (noting wholly separate and secular nature of public bus fare to schools), with *Wolman*, 433 U. S., at 254 ("The field trips are an integral part of the educational experience, and where the teacher works within and for a sectarian institution, an unacceptable risk of fostering of religion is an inevitable by-product" (citation omitted)).   We likewise were able to uphold underwriting the expenses of standard state testing in religious schools while being forced to strike down aid for testing designed by the school officials, because the latter tests could be used to reinforce religious teaching.   Compare *id.*, at 240 ("[T]he State provides both the schools and the school district with the means of ensuring that the minimum standards are met.   The nonpublic school does not control the content of the test or its result.   This serves to prevent the use of the test as part of religious teaching, and thus avoids that kind of direct aid to religion found present in *Levitt*"); *Committee for Public Ed. and Religious Liberty* v. *Regan*, 444 U. S. 646, 661–662 (1980) (same), with *Levitt*, 413 U. S., at 480 ("We cannot ignore the substantial risk that these examinations, prepared by teachers under the authority of religious institutions, will be drafted with an eye, unconsciously or otherwise, to inculcate students in the religious precepts of the sponsoring church").

---

[15] In *Lemon*, we also specifically examined the risk that a government program that paid religious teachers would support religious education; the teachers posed the risk of being unable to separate secular from religious education.   Although we invalidated the program on entanglement grounds, we suggested that the monitoring the State had established in that case was actually required to eliminate the risk of diversion.   See 403 U. S., at 619; see also n. 11, *supra*.

With the same point in mind, we held that buildings constructed with government grants to universities with religious affiliation must be barred from religious use indefinitely to prevent the diversion of government funds to religious objectives. *Tilton*, 403 U. S., at 683 (plurality opinion) ("If, at the end of 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion. To this extent the Act therefore trespasses on the Religion Clauses"); see also *Hunt*, 413 U. S., at 743–744. We were accordingly constrained to strike down aid for repairing buildings of nonpublic schools because they could be used for religious education. *Nyquist*, 413 U. S., at 776–777.

Divertibility was, again, the issue in an order remanding an as-applied challenge to a grant supporting counseling on teenage sexuality for findings that the aid had not been used to support religious education. *Bowen*, 487 U. S., at 621; see also *id.*, at 623 (O'CONNOR, J., concurring). And the most recent example of attention to the significance of divertibility occurred in our explanation that public school teachers could be assigned to provide limited instruction in religious schools in *Agostini*, 521 U. S., at 223–227, a majority of the Court rejecting the factual assumption that public school teachers could be readily lured into providing religious instruction.[16]

---

[16] The plurality is mistaken in its reading of *Zobrest*. See *ante*, at 820–821. *Zobrest* does not reject the principle of divertibility. There the government provided only a translator who was not considered divertible because he did not add to or subtract from the religious message. The Court approved the translator as it would approve a hearing aid, health services, diagnostics, and tests. See *Zobrest*, 509 U. S., at 13, and n. 10. Cf. *Bradfield* v. *Roberts*, 175 U. S. 291, 299–300 (1899); *Wolman*, 433 U. S., at 244. *Zobrest* thus can be thought of as akin to our approval of diagnostic services in *Wolman*, *supra*, at 244, which we considered to have "little or no educational content[,] not [to be] closely associated with the educational mission of the nonpublic school," and not to pose "an impermissible

Third, our cases have recognized the distinction, adopted by statute in the Chapter 2 legislation, between aid that merely supplements and aid that supplants expenditures for offerings at religious schools, the latter being barred. Although we have never adopted the position that any benefit that flows to a religious school is impermissible because it frees up resources for the school to engage in religious indoctrination, *Hunt, supra,* at 743, from our first decision holding it permissible to provide textbooks for religious schools we have repeatedly explained the unconstitutionality of aid that supplants an item of the school's traditional expense. See, *e. g., Cochran* v. *Louisiana Bd. of Ed.,* 281 U. S. 370, 375 (1930) (noting that religious schools "are not the beneficiaries of these appropriations. They obtain nothing from them, nor are they relieved of a single obligation because of them" (internal quotation marks omitted)); *Everson,* 330 U. S., at 18 (specifically noting that bus fare program did not support or fund religious schools); *Allen,* 392 U. S., at 244 (stating that "the financial benefit [of providing the textbooks] is to parents and children, not to schools" (footnote omitted)); *id.,*

---

risk of the fostering of ideological views." The fact that the dissent saw things otherwise (as the plurality points out, *ante,* at 821) is beside the point here.

Similarly, the plurality is mistaken in reading our holdings in *Mueller* and *Witters,* see *ante,* at 821, to undermine divertibility as a relevant principle. First, these cases approved quite factually distinct types of aid; *Mueller* involving tax deductions, which have a quite separate history of approval, see 463 U. S., at 396, and nn. 5, 6 (citing *Walz* v. *Tax Comm'n of City of New York,* 397 U. S. 664 (1970)), and *Witters* involving scholarship money distributed to a university, not a primary or secondary school, see *Tilton,* 403 U. S., at 685–686, that was not significant enough as a whole to support that institution, *Witters,* 474 U. S., at 488. Second, in neither case did the program at issue provide direct aid on a schoolwide basis (as Chapter 2 does here); in both we found a distinction based on the genuinely independent, private choices which allocated such very different types of aid (tax deductions and university scholarship money that did not amount to substantial support of the university). See *Mueller, supra,* at 399; *Witters, supra,* at 488.

at 244, n. 6 (explicitly recognizing that "the record contains no evidence that any of the private schools in appellants' districts previously provided textbooks for their students"); *Lemon*, 403 U. S., at 656 (opinion of Brennan, J.) (noting no aid to schools was involved in *Allen*). We ignored this prohibition only once, in *Regan*, 444 U. S., at 646; see also *ante*, at 16, n. 7, where reimbursement for budgeted expenses of required testing was not struck down, but we then quickly returned to the rule as a guideline for permissible aid.[17] In *Zobrest*, 509 U. S., at 12, the Court specifically distinguished *Meek* and *Ball* by explaining that the invalid programs in those cases "relieved sectarian schools of costs they otherwise would have borne in educating their students." In *Agostini*, the Court made a point of noting that the objects of the aid were "by law supplemental to the regular curricula" and, citing *Zobrest*, explained that the remedial education services did not relieve the religious schools of costs they would otherwise have borne. 521 U. S., at 228 (citing *Zobrest, supra*, at 12). The Court explicitly stated that the

---

[17] Our departure from this principle in *Regan* is not easily explained, but it is an isolated holding surrounded by otherwise unbroken adherence to the no-supplanting principle. Long after *Regan* we have continued to find the supplement/supplant distinction, like the bar to substantial aid, to be an important consideration. See *Zobrest, supra*, at 12; *Agostini*, 521 U. S., at 228; cf. *Witters, supra*, at 487–488 (discussing rule against "direct subsidy"). The weight that the plurality places on *Regan* is thus too much for it to bear. See *ante*, at 815, n. 7. Moreover, the apparent object of the *Regan* Court's concern was vindicating the principle that aid with fixed secular content was permissible, distinguishing it from the divertible testing aid in *Levitt*. *Regan*, 444 U. S., at 661–662 (citing *Wolman, supra*, at 263); cf. *Levitt*, 413 U. S., at 480. The plurality provides no explanation for our continued reference to the principle of no-supplanting aid in subsequent cases, such as *Zobrest* and *Agostini*, which it finds trustworthy guides elsewhere in its discussion of the First Amendment. See *ante*, at 822–823, 825, 827, 829–832. Nor does the plurality explain why it places so much weight on *Regan*'s apparent departure from the no-supplanting rule while it ignores *Regan*'s core reasoning that the testing aid there was permissible because, in direct contrast to *Levitt*, the aid was not divertible.

services in question did not "supplant the remedial instruction and guidance counseling already provided in New York City's sectarian schools." 521 U. S., at 229.

Finally, we have recognized what is obvious (however imprecise), in holding "substantial" amounts of aid to be unconstitutional whether or not a plaintiff can show that it supplants a specific item of expense a religious school would have borne.[18] In *Meek*, 421 U. S., at 366, we invalidated the loan of instructional materials to religious schools because "faced with the substantial amounts of direct support authorized by [the program], it would simply ignore reality to attempt to separate secular educational functions from the predominantly religious role performed by many of Pennsylvania's church-related elementary and secondary schools and then characterize [the program] as channeling aid to the secular without providing direct aid to the sectarian." *Id.*, at 365. See *id.*, at 366 ("Substantial aid to the educational function of such schools . . . necessarily results in aid to the sectarian school enterprise as a whole"); see also *Nyquist*, 413 U. S., at 783; *Wolman*, 433 U. S., at 250–251. In *Witters*, 474 U. S., at 488, the Court asked whether the aid in question was a direct subsidy to religious schools and addressed the substantiality of the aid obliquely in noting that "nothing in the record indicates that . . . any significant portion of the

---

[18] I do not read the plurality to question the prohibition on substantial aid. The plurality challenges any rule based on the proportion of aid that a program provides to religious recipients, citing *Witters* and *Agostini*. See *ante*, at 812, n. 6. I reject the plurality's reasoning. The plurality misreads *Witters;* Justice Marshall, writing for the Court in *Witters*, emphasized that only a small amount of aid was provided to religious institutions, 474 U. S., at 488, and no controlling majority rejected the importance of this fact. The plurality also overreads *Agostini, supra,* at 229, which simply declined to adopt a rule based on proportionality. Moreover, regardless of whether the proportion of aid actually provided to religious schools is relevant, we have never questioned our holding in *Meek* that substantial aid to religious schools is prohibited.

aid expended under the Washington program as a whole will end up flowing to religious education." In *Zobrest, supra,* at 12, the Court spoke of the substantiality test in *Meek,* noting that "[d]isabled children, not sectarian schools, are the primary beneficiaries of the [Individuals with Disabilities Act (IDEA)]; to the extent sectarian schools benefit at all from the IDEA, they are only incidental beneficiaries."

## C

This stretch of doctrinal history leaves one point clear beyond peradventure: together with James Madison we have consistently understood the Establishment Clause to impose a substantive prohibition against public aid to religion and, hence, to the religious mission of sectarian schools. Evenhandedness neutrality is one, nondispositive pointer toward an intent and (to a lesser degree) probable effect on the permissible side of the line between forbidden aid and general public welfare benefit. Other pointers are facts about the religious mission and education level of benefited schools and their pupils, the pathway by which a benefit travels from public treasury to educational effect, the form and content of the aid, its adaptability to religious ends, and its effects on school budgets. The object of all enquiries into such matters is the same whatever the particular circumstances: is the benefit intended to aid in providing the religious element of the education and is it likely to do so?

The substance of the law has thus not changed since *Everson.* Emphasis on one sort of fact or another has varied depending on the perceived utility of the enquiry, but all that has been added is repeated explanation of relevant considerations, confirming that our predecessors were right in their prophecies that no simple test would emerge to allow easy application of the establishment principle.

The plurality, however, would reject that lesson. The majority misapplies it.

### III

#### A

The nub of the plurality's new position is this:

"[I]f the government, seeking to further some legitimate secular purpose, offers aid on the same terms, without regard to religion, to all who adequately further that purpose, then it is fair to say that any aid going to a religious recipient only has the effect of furthering that secular purpose. The government, in crafting such an aid program, has had to conclude that a given level of aid is necessary to further that purpose among secular recipients and has provided no more than that same level to religious recipients." *Ante,* at 810 (citation omitted).

As a break with consistent doctrine the plurality's new criterion is unequaled in the history of Establishment Clause interpretation. Simple on its face, it appears to take even-handedness neutrality and in practical terms promote it to a single and sufficient test for the establishment constitutionality of school aid. Even on its own terms, its errors are manifold, and attention to at least three of its mistaken assumptions will show the degree to which the plurality's proposal would replace the principle of no aid with a formula for generous religious support.

First, the plurality treats an external observer's attribution of religious support to the government as the sole impermissible effect of a government aid scheme. See, *e. g., ante,* at 809 ("[N]o one would conclude that any indoctrination that any particular recipient conducts has been done at the behest of the government"). While perceived state endorsement of religion is undoubtedly a relevant concern under the Establishment Clause, see, *e. g., Allegheny County,* 492 U. S., at 592–594; see also *Capitol Square Review and Advisory Bd.* v. *Pinette,* 515 U. S. 753, 772–774 (1995) (O'CONNOR, J., concurring in part and concurring in

judgment); *id.*, at 786–787 (SOUTER, J., concurring in part and concurring in judgment), it is certainly not the only one. *Everson* made this clear from the start: secret aid to religion by the government is also barred. 330 U. S., at 16. State aid not attributed to the government would still violate a taxpayer's liberty of conscience, threaten to corrupt religion, and generate disputes over aid. In any event, since the same-terms feature of the scheme would, on the plurality's view, rule out the attribution or perception of endorsement, adopting the plurality's rule of facial evenhandedness would convert neutrality into a dispositive criterion of establishment constitutionality and eliminate the effects enquiry directed by *Allen, Lemon,* and other cases. Under the plurality's rule of neutrality, if a program met the first part of the *Lemon* enquiry, by declining to define a program's recipients by religion, it would automatically satisfy the second, in supposedly having no impermissible effect of aiding religion.[19]

Second, the plurality apparently assumes as a fact that equal amounts of aid to religious and nonreligious schools will have exclusively secular and equal effects, on both external perception and on incentives to attend different schools. See *ante,* at 809–810, 813–814. But there is no reason to believe that this will be the case; the effects of same-terms aid may not be confined to the secular sphere at all. This is the reason that we have long recognized that unrestricted aid to religious schools will support religious teaching in ad-

---

[19] Adopting the plurality's rule would permit practically any government aid to religion so long as it could be supplied on terms ostensibly comparable to the terms under which aid was provided to nonreligious recipients. As a principle of constitutional sufficiency, the manipulability of this rule is breathtaking. A legislature would merely need to state a secular objective in order to legalize massive aid to all religions, one religion, or even one sect, to which its largess could be directed through the easy exercise of crafting facially neutral terms under which to offer aid favoring that religious group. Short of formally replacing the Establishment Clause, a more dependable key to the public fisc or a cleaner break with prior law would be difficult to imagine.

dition to secular education, a fact that would be true no matter what the supposedly secular purpose of the law might be.

Third, the plurality assumes that per capita distribution rules safeguard the same principles as independent, private choices. But that is clearly not so. We approved university scholarships in *Witters* because we found them close to giving a government employee a paycheck and allowing him to spend it as he chose, but a per capita aid program is a far cry from awarding scholarships to individuals, one of whom makes an independent private choice. Not the least of the significant differences between per capita aid and aid individually determined and directed is the right and genuine opportunity of the recipient to choose not to give the aid.[20] To hold otherwise would be to license the government to donate funds to churches based on the number of their members, on the patent fiction of independent private choice.

The plurality's mistaken assumptions explain and underscore its sharp break with the Framers' understanding of establishment and this Court's consistent interpretative course. Under the plurality's regime, little would be left of the right of conscience against compelled support for religion; the more massive the aid the more potent would be the influence of the government on the teaching mission; the more generous the support, the more divisive would be the resentments of those resisting religious support, and those religions without school systems ready to claim their fair share.

B

The plurality's conception of evenhandedness does not, however, control the case, whose disposition turns on the misapplication of accepted categories of school aid analysis. The facts most obviously relevant to the Chapter 2 scheme

---

[20] Indeed, the opportunity for an individual to choose not to have her religious school receive government aid is just what at least one of the respondents seeks here. See Brief for Respondents 1, and n. 1.

in Jefferson Parish are those showing divertibility and actual diversion in the circumstance of pervasively sectarian religious schools. The type of aid, the structure of the program, and the lack of effective safeguards clearly demonstrate the divertibility of the aid. While little is known about its use, owing to the anemic enforcement system in the parish, even the thin record before us reveals that actual diversion occurred.

The aid that the government provided was highly susceptible to unconstitutional use. Much of the equipment provided under Chapter 2 was not of the type provided for individual students, App. to Pet. for Cert. 140a; App. 262a–278a, but included "slide projectors, movie projectors, overhead projectors, television sets, tape recorders, projection screens, maps, globes, filmstrips, cassettes, computers," and computer software and peripherals, *Helms* v. *Cody*, No. 85–5533, 1990 WL 36124 (ED La., Mar. 27, 1990); App. to Pet. for Cert. 140a; App. 90a, 262a–278a, as well as library books and materials, *id.*, at 56a, 126a, 280a–284a. The videocassette players, overhead projectors, and other instructional aids were of the sort that we have found can easily be used by religious teachers for religious purposes. *Meek*, 421 U. S., at 363; *Wolman*, 433 U. S., at 249–250. The same was true of the computers, which were as readily employable for religious teaching as the other equipment, and presumably as immune to any countervailing safeguard, App. 90a, 118a, 164a–165a. Although library books, like textbooks, have fixed content, religious teachers can assign secular library books for religious critique, and books for libraries may be religious, as any divinity school library would demonstrate. The sheer number and variety of books that could be and were ordered gave ample opportunity for such diversion.

The divertibility thus inherent in the forms of Chapter 2 aid was enhanced by the structure of the program in Jefferson Parish. Requests for specific items under Chapter 2 came not from secular officials, cf. *Allen*, 392 U. S., at 244–

245, but from officials of the religious schools (and even parents of religious school pupils), see *ante*, at 803 (noting that private religious schools submitted their orders to the government for specific requested items); App. 156a–158a. The sectarian schools decided what they wanted and often ordered the supplies, *id.*, at 156a–159a, 171a–172a, to be forwarded directly to themselves, *id.*, at 156a–159a. It was easy to select whatever instructional materials and library books the schools wanted, just as it was easy to employ computers for the support of the religious content of the curriculum infused with religious instruction.

The concern with divertibility thus predicated is underscored by the fact that the religious schools in question here covered the primary and secondary grades, the grades in which the sectarian nature of instruction is characteristically the most pervasive, see *Lemon*, 403 U. S., at 616; cf. *Tilton*, 403 U. S., at 686–689, and in which pupils are the least critical of the schools' religious objectives, see *Lemon, supra*, at 616. No one, indeed, disputes the trial judge's findings, based on a detailed record, that the Roman Catholic schools,[21] which made up the majority of the private schools participating,[22] were pervasively sectarian,[23] that

---

[21] Litigation, discovery, and the opinions below focused almost exclusively on the aid to the 34 Roman Catholic schools. Consequently, I will confine my discussion to that information. Of course, the same concerns would be raised by government aid to religious schools of other faiths that a court found had similar missions of religious education and religious teachers teaching religiously.

[22] The Jefferson Parish Chapter 2 program included 46 nonpublic schools, of which 41 were religiously affiliated. Thirty-four of these were Roman Catholic, seven others were religiously affiliated, and five were not religiously affiliated. App. to Pet. for Cert. 143a–144a.

[23] The trial judge found that the Roman Catholic schools in question operate under the general supervision and authority of the Archbishop of New Orleans and their parish pastors, and are located next to parish churches and sometimes a rectory or convent. *Id.*, at 144a. The schools include religious symbols in their classrooms, App. 75a, require attendance at daily religion classes, *id.*, at 76a, conduct sacramental preparation

their common objective and mission was to engage in religious education,[24] and that their teachers taught religiously,[25] making them precisely the kind of primary and

classes during the schoolday, require attendance at mass, and provide extracurricular religious activities. At least some exercise a religious preference in accepting students and in charging tuition. App. to Pet. for Cert. 145a.

[24] The District Court found that the mission of the Roman Catholic schools is religious education based on the Archdiocese's and the individual schools' published statements of philosophy. For example, the St. Anthony School Handbook, cited by the District Court, reads:

"Catholic education is intended to make men's faith become living, conscious and active through the light of instruction. The Catholic school is the unique setting within which this ideal can be realized in the lives of the Catholic children and young people.

"Only in such a school can they experience learning and living fully integrated in the light of faith. . . . Here, too, instruction in religious truth and values is an integral part of the school program. It is not one more subject along side the rest, but instead it is perceived and functions as the underlying reality in which the student's experiences of learning and living achieve their coherence and their deepest meaning." *Ibid.*

The Handbook of Policies and Regulations for Elementary Schools of the Archdiocese of New Orleans indicates that the operation of the Roman Catholic schools is governed by canon law. It also lists the major objectives of those schools as follows:

"To work closely with the home in educating children towards the fullness of Christian life.

"To specifically teach Catholic principles and Christian values." *Id.,* at 146a.

The mission statements and objectives outlined by the other Roman Catholic schools also support the conclusion that these institutions' primary objective is religious instruction. See also App. 65a, 71a.

[25] The Archdiocese's official policy calls for religious preferences in hiring and the contracts of principals and teachers in its schools contain a provision allowing for termination for lifestyle contrary to the teachings of the Roman Catholic church. App. to Pet. for Cert. 145a. One of the objectives of the handbook is "[t]o encourage teachers to become committed Christians and to develop professional competence." *Id.,* at 146a. Other record evidence supports the conclusion that these religious schoolteachers teach religiously. See, *e. g.,* App. 125a (deposition of president of sectarian high school) ("Our teachers, whether they are religion teachers

secondary religious schools that raise the most serious Establishment Clause concerns. See *Walz,* 397 U. S., at 671; *Hunt,* 413 U. S., at 743; *Lemon, supra,* at 636–637. The threat to Establishment Clause values was accordingly at its highest in the circumstances of this case. Such precautionary features as there were in the Jefferson Parish scheme were grossly inadequate to counter the threat. To be sure, the disbursement of the aid was subject to statutory admonitions against diversion, see, *e. g.,* 20 U. S. C. §§ 7332, 8897, and was supposedly subject to a variety of safeguards, see *ante,* at 802–803, 832–834. But the provisions for onsite monitoring visits, labeling of government property, and government oversight cannot be accepted as sufficient in the face of record evidence that the safeguard provisions proved to be empty phrases in Jefferson Parish. Cf. *Agostini,* 521 U. S., at 228–229; *Zobrest,* 509 U. S., at 13 (accepting precautionary provisions in absence of evidence of their uselessness).

The plurality has already noted at length the ineffectiveness of the government's monitoring program. *Ante,* at 832–834; see also App. 111a ("A system to monitor nonpublic schools was often not in operation and therefore the [local educational agency] did not always know: (a) what was purchased or (b) how it was utilized"). Monitors visited a nonpublic school only sporadically, discussed the program with a single contact person, observed nothing more than attempts at recordkeeping, and failed to inform the teachers of the restrictions involved. *Id.,* at 154a–155a. Although Chapter 2 required labeling of government property, it occurred haphazardly at best, *id.,* at 113a, and the government's sole monitoring system for computer use amounted to nothing more

---

or not, are certainly instructed that when issues come up in the classroom that have a religious, moral, or value concept, that their answers be consistent with the teachings of the Catholic Church and that they respond in that way to the students, so that there can be opportunities in other classes other than religion where discussion of religio[n] could take place, yes, sir"); *id.,* at 73a, 74a.

than questioning school officials and examining the location of computers at the schools, *id.*, at 118a. No records of software and computer use were kept, and no such recordkeeping was even planned. *Id.*, at 118a, 164a–166a. State and local officials in Jefferson Parish admitted that nothing prevented the Chapter 2 computers from being used for religious instruction, *id.*, at 102a, 118a, 164a–166a, and although they knew of methods of monitoring computer usage, such as locking the computer functions, *id.*, at 165a–166a, they implemented no particular policies, instituted no systems, and employed no technologies to minimize the likelihood of diversion to religious uses,[26] *id.*, at 118a, 165a–166a. The watchdogs did require the religious schools to give not so much as an assurance that they would use Chapter 2 computers solely for secular purposes, *Helms* v. *Picard*, 151 F. 3d 347, 368 (1998), amended, 165 F. 3d 311 (CA5 1999); App. 94a–95a. Government officials themselves admitted that there was no way to tell whether instructional materials had been diverted, *id.*, at 118a, 139a, 144a–145a, and, as the plurality notes, the only screening mechanism in the library book scheme was a review of titles by a single government official, *ante*, at 832–833, n. 15; see App. 137a. The government did not even have a policy on the consequences of noncompliance. *Id.*, at 145a.

The risk of immediate diversion of Chapter 2 benefits had its complement in the risk of future diversion, against which the Jefferson Parish program had absolutely no protection. By statute all purchases with Chapter 2 aid were to remain the property of the United States, 20 U. S. C. § 7372(c)(1), merely being "lent" to the recipient nonpublic schools. In actuality, however, the record indicates that nothing in the

---

[26] The Government's reliance on U. S. Department of Education Guidance for Title VI of the Elementary and Secondary Education Act (Feb. 1999) is misplaced. See App. to Brief for Secretary of Education 1a. It was not in place when discovery closed in this matter, and merely highlights the reasons for a lack of evidence on diversion or compliance.

Jefferson Parish program stood in the way of giving the Chapter 2 property outright to the religious schools when it became older. Although old equipment remained the property of the local education agency, a local government administrative body, one agency employee testified that there was no set policy for dealing with old computers, which were probably given outright to the religious schools. App. 161a–162a. The witness said that government-funded instructional materials, too, were probably left with the religious schools when they were old, and that it was unclear whether library books were ever to be returned to the government. *Ibid.*

Providing such governmental aid without effective safeguards against future diversion itself offends the Establishment Clause, *Tilton,* 403 U. S., at 682–684; *Nyquist,* 413 U. S., at 776–777, and even without evidence of actual diversion, our cases have repeatedly held that a "substantial risk" of it suffices to invalidate a government aid program on establishment grounds. See, *e. g., Wolman,* 433 U. S., at 254 (invalidating aid for transportation on teacher-accompanied field trips because an "unacceptable risk of fostering of religion" was "an inevitable byproduct"); *Meek,* 421 U. S., at 372 (striking down program because of a "potential for impermissible fostering of religion"); *Levitt,* 413 U. S., at 480 (invalidating aid for tests designed by religious teachers because of "the substantial risk that . . . examinations, prepared by teachers under the authority of religious institutions, will be drafted with an eye, unconsciously or otherwise, to inculcate students in the religious precepts of the sponsoring church"); *Lemon,* 403 U. S., at 619 (finding invalid aid with a "potential for impermissible fostering of religion"); cf. *Bowen,* 487 U. S., at 621 (noting that where diversion risk is less clearly made out, a case may be remanded for findings on actual diversion of aid to religious indoctrination); *Regan,* 444 U. S., at 656 (characterizing as "minimal" the chance that state-drafted tests with "complete" safeguards would be adopted to reli-

gious testing). A substantial risk of diversion in this case was more than clear, as the plurality has conceded. The First Amendment was violated.

But the record here goes beyond risk, to instances of actual diversion. What one would expect from such paltry efforts at monitoring and enforcement naturally resulted, and the record strongly suggests that other, undocumented diversions probably occurred as well. First, the record shows actual diversion in the library book program. App. 132a–133a. Although only limited evidence exists, it contrasts starkly with the records of the numerous textbook programs that we have repeatedly upheld, where there was no evidence of any actual diversion. See *Allen,* 392 U. S., at 244–245; *Meek, supra,* at 361–362; *Wolman, supra,* at 237–238. Here, discovery revealed that under Chapter 2, nonpublic schools requested and the government purchased at least 191 religious books with taxpayer funds by December 1985.[27] App. 133a. Books such as A Child's Book of Prayers, *id.,* at 84a, and The Illustrated Life of Jesus, *id.,* at 132a,

---

[27] The plurality applies inconsistent standards to the evidence. Although the plurality finds more limited evidence of actual diversion sufficient to support a general finding of diversion in the computer and instructional materials context, even in the face of JUSTICE O'CONNOR's objections, it fails to find a violation of the prohibition against providing aid with religious content based on the more stark, undisputed evidence of religious books. Compare *ante,* at 832–834, and nn. 14–17, with *ante,* at 834–835. As a matter of precedent, the correct evidentiary standard is clearly the former: "[A]ny use of public funds to promote religious doctrines violates the Establishment Clause." *Bowen,* 487 U. S., at 623 (O'CONNOR, J., concurring). We have never before found any actual diversion or allowed a risk of it; we have struck down policies that might permit it, *e. g., Tilton,* 403 U. S., at 682–684, or have remanded for specific factual findings about whether diversion occurred, *Bowen, supra,* at 621. See *supra,* at 890–895. As a matter of principle, this low threshold is required to safeguard the values of the First Amendment. Madison's words make clear that even a small infringement of the prohibition on compelled aid to religion is odious to the freedom of conscience. No less does it open the door to the threat of corruption or to a return to religious conflict.

were discovered among others that had been ordered under the program. See also *id.,* at 59a–62a.

The evidence persuasively suggests that other aid was actually diverted as well. The principal of one religious school testified, for example, that computers lent with Chapter 2 funds were joined in a network with other non-Chapter 2 computers in some schools, and that religious officials and teachers were allowed to develop their own unregulated software for use on this network. *Id.,* at 77a. She admitted that the Chapter 2 computer took over the support of the computing system whenever there was a breakdown of the master computer purchased with the religious school's own funds. *Ibid.* Moreover, as the plurality observes, *ante,* at 833–834, n. 17, comparing the records of considerable federal funding of audiovisual equipment in religious schools with records of the schools' use of unidentified audiovisual equipment in religion classes strongly suggests that film projectors and videotape machines purchased with public funds were used in religious indoctrination over a period of at least seven years. App. 205a, 210a, 206a–207a; see also *id.,* at 108a (statement of second-grade teacher indicating that she used audiovisual materials in all classes).

Indeed, the plurality readily recognizes that the aid in question here was divertible and that substantial evidence of actual diversion exists. *Ante,* at 832–834, and nn. 14–17. Although JUSTICE O'CONNOR attributes limited significance to the evidence of divertibility and actual diversion, she also recognizes that it exists. *Ante,* at 864–865 (opinion concurring in judgment). The Court has no choice but to hold that the program as applied violated the Establishment Clause.[28]

---

[28] Since the divertibility and diversion require a finding of unconstitutionality, I will not explore other grounds, beyond noting the likelihood that unconstitutional supplantation occurred as well. The record demonstrates that Chapter 2 aid impermissibly relieved religious schools of some costs that they otherwise would have borne, and so unconstitutionally sup-

## IV

The plurality would break with the law. The majority misapplies it. That misapplication is, however, the only consolation in the case, which reaches an erroneous result but does not stage a doctrinal coup. But there is no mistaking the abandonment of doctrine that would occur if the plurality were to become a majority. It is beyond question that the plurality's notion of evenhandedness neutrality as a practical guarantee of the validity of aid to sectarian schools would be the end of the principle of no aid to the schools' religious mission. And if that were not so obvious it would become so after reflecting on the plurality's thoughts about diversion

---

planted support in some budgetary categories. The record of affidavits and evaluation forms by religious schoolteachers and officials indicates that Chapter 2 aid was significant in the development of teaching curriculums, the introduction of new programs, and the support of old ones. App. 105a–108a, 184a–185a. The evidence shows that the concept of supplementing instead of supplanting was poorly understood by the sole government official administering the program, who apparently believed that the bar on supplanting was nothing more than a prohibition on paying for replacements of equipment that religious schools had previously purchased. *Id.,* at 167a. Government officials admitted that there was no way to determine whether payments for materials, equipment, books, or other assistance provided under the program reduced the amount of money budgeted for library and educational equipment, *id.,* at 145a–146a, and the 1985 Monitoring Report shows that the officials of at least one religious school admitted that the government aid was used to create the library, with the school's regular funds, when occasionally available, used merely to supplement the government money, Fine Deposition, *id.,* at 63a. The use records for audiovisual materials at one religious high school revealed that Chapter 2 funds were essential to the school's educational process, *id.,* at 187a, and a different school, as already noted, used a Chapter 2 computer to support its computer network when its own computers failed, *id.,* at 77a. The record is sparse, but these incidents suggest that the constitutional and statutory prohibition on supplanting expenses may have been largely aspirational. It seems that the program in Jefferson Parish violated the statute and ran afoul of the Constitution. Cf. *Nyquist,* 413 U. S., at 783; *Zobrest,* 509 U. S., at 12.

and about giving attention to the pervasiveness of a school's sectarian teaching.

The plurality is candid in pointing out the extent of actual diversion of Chapter 2 aid to religious use in the case before us, *ante*, at 832–834, and n. 17, and equally candid in saying it does not matter, *ante*, at 820–825, 833–834. To the plurality there is nothing wrong with aiding a school's religious mission; the only question is whether religious teaching obtains its tax support under a formally evenhanded criterion of distribution. The principle of no aid to religious teaching has no independent significance.

And if this were not enough to prove that no aid in religious school aid is dead under the plurality's First Amendment, the point is nailed down in the plurality's attack on the legitimacy of considering a school's pervasively sectarian character when judging whether aid to the school is likely to aid its religious mission. *Ante*, at 826–829. The relevance of this consideration is simply a matter of common sense: where religious indoctrination pervades school activities of children and adolescents, it takes great care to be able to aid the school without supporting the doctrinal effort. This is obvious. The plurality nonetheless condemns any enquiry into the pervasiveness of doctrinal content as a remnant of anti-Catholic bigotry (as if evangelical Protestant schools and Orthodox Jewish yeshivas were never pervasively sectarian[29]), and it equates a refusal to aid religious schools with hostility to religion (as if aid to religious teaching were not

---

[29] Indeed, one group of *amici curiae*, which consists of "religious and educational leaders from a broad range of both Eastern and Western religious traditions, and Methodist, Jewish and Seventh-day Adventist individuals" including "church administrators, administrators of religious elementary and secondary school systems; elementary and secondary school teachers at religious schools; and pastors and laity who serve on church school boards," identifies its members as having "broad experience teaching in and administering pervasively sectarian schools." Brief for Interfaith Religious Liberty Foundation et al. as *Amici Curiae* 1.

opposed in this very case by at least one religious respondent[30] and numerous religious *amici curiae*[31] in a tradition claiming descent from Roger Williams). My concern with these arguments goes not so much to their details[32] as it does to the fact that the plurality's choice to employ imputations of bigotry and irreligion as terms in the Court's debate makes one point clear: that in rejecting the principle of no aid to a school's religious mission the plurality is attacking the most fundamental assumption underlying the Establishment Clause, that government can in fact operate with neutrality in its relation to religion. I believe that it can, and so respectfully dissent.

---

[30] One of the respondents describes herself as a "life-long, committed member of the Roman Catholic Church" who "objects to the government providing benefits to her parish school" because "[s]he has seen the chilling effect such entangling government aid has on the religious mission of schools run by her church." Brief for Respondents 1. She has been a member of the church for about 36 years, and six of her children attended different Jefferson Parish Catholic run schools. *Id.*, at 1, n. 1.

[31] *E. g.*, Brief for Baptist Joint Committee on Public Affairs as *Amicus Curiae;* Brief for Interfaith Religious Liberty Foundation et al. as *Amici Curiae;* Brief for National Committee for Public Education and Religious Liberty et al. as *Amici Curiae.*

[32] I do not think it worthwhile to comment at length, for example, on the plurality's clear misunderstanding of our access-to-public-forum cases, such as *Lamb's Chapel* and *Widmar* v. *Vincent,* 454 U. S. 263 (1981), as "decisions that have prohibited governments from discriminating in the distribution of public benefits based on religious status or sincerity," *ante,* at 828, when they were decided on completely different and narrowly limited free-speech grounds. Nor would it be worthwhile here to engage in extended discussion of why the goal of preventing courts from having to "trol[l] through a person's or institution's religious beliefs," *ibid.*, calls for less aid and commingling of government with religion, not for tolerance of their effects.